**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 26 1998**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

No. 97-2256

ERVING L. (a juvenile),

Defendant-Appellee.

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-96-747-MV)**

Richard A. Friedman, Attorney, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (John J. Kelly, United States Attorney, Sharon R. Kimball, Assistant United States Attorney, District of New Mexico, with him on the brief) for Appellant.

Ann Steinmetz, Federal Public Defender, Albuquerque, New Mexico, (Judith A. Rosenstein, Assistant Federal Public Defender, Albuquerque, New Mexico, on the brief), for Appellee.

Before **ANDERSON, McWILLIAMS,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

# I. INTRODUCTION

The United States brings this interlocutory appeal challenging a suppression order entered by the United States District Court for the District of New Mexico. The district court suppressed all inculpatory statements made by E.L., a thirteen-year-old Navajo juvenile, in response to questioning by law enforcement officers. The district court suppressed the statements on two grounds: (1) the officers elicited the statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) E.L.'s statements were not voluntarily made. Exercising jurisdiction pursuant to 18 U.S.C. § 3731, this court concludes that a reasonable thirteen-year-old in E.L.'s position would not have believed he was in custody and that the actions of the officers were not coercive so as to render E.L.'s confession involuntary. Accordingly, we **reverse** the district court's order of suppression and **remand** the case to the district court for further proceedings consistent with this opinion.

# II. BACKGROUND

*A. The Interview*

On appeal from an order of suppression, this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party. *See United States v. Maden*, 64 F.3d

1505, 1508 (10th Cir. 1995). Viewed from that perspective, the facts surrounding E.L.'s statements to the officers are as follows.

In early July 1996, Navajo Nation criminal investigator Larry Etsitty received a report that an eleven-year-old girl had been sexually assaulted by her cousin, the defendant E.L. After receiving the report, Agent Etsitty talked with the girl, her mother, and hospital personnel. Based on these interviews, Agent Etsitty decided to interview E.L.

On July 18, 1996, Agent Etsitty and FBI Special Agent John Tanberg went to E.L.'s home to interview him. The officers arrived at the family's mobile home in plain clothes and in an unmarked car at about 3:00 p.m. They were greeted by E.L.'s father, who previously had been alerted of their purpose. The officers identified themselves and were invited into the home by the father. They were introduced to E.L.'s mother and to E.L. and all five sat down in the living room.

The officers explained they had received an accusation that E.L. sexually abused his cousin and asked for permission to talk to E.L. E.L.'s parents gave the requested permission. Initially, E.L. did not respond to the officers' questions. Instead, he sat in silence and began to cry. E.L.'s parents spoke to him in Navajo and told him that he should talk to the investigators. E.L.'s mother told him it would help to clear his conscience.

Agent Tanberg then explained to E.L. in English why the officers were there and that they wanted to hear his version of the story. E.L. did not respond. When Agent Tanberg handed E.L. a note pad and a pen and asked if he could write down his thoughts, E.L. just held the pad and pen in silence.

In response to E.L.'s continued silence, Agent Tanberg explained to E.L. that he was not in custody and that he was not going to be arrested after their discussion no matter what he told them. Agent Tanberg then asked E.L. to read aloud in English from an advice-of-rights form[1] used by the FBI. After he finished reading the form aloud, the agents asked E.L. if there was anything in the form which he did not understand. He asked for an explanation of the word "advice" in the phrase, "You have the right to talk to a lawyer for advice before we ask you any questions." He also asked for an explanation of the word "coercion" in the phrase, "[N]o pressure or coercion of any kind has been used against me." Agent Tanberg explained the terms in English and Agent Etsitty, speaking in Navajo, went over the rights in general and the two terms in particular. Agent Etsitty used the Navajo word for "advice" to explain the meaning of that term, and E.L. said he understood. Agent Etsitty explained the idea of a lack of coercion by using the Navajo word for "not being forced." E.L.

---

[1] The United States' unopposed motion to supplement the record on appeal with the advice-of-rights form as well as three other exhibits introduced at the suppression hearing is hereby **GRANTED**.

initialed those two words on the form to signify that he understood them.  E.L.'s parents were asked if they had any questions about the rights.  They did not.  E.L. was asked if he understood his rights.  He said that he did and he signed the waiver portion of the advice-of-rights form, with his parents signing as witnesses.

Agent Etsitty then explained that it was very important for E.L. to tell the truth and that the officers wanted to hear his side of the story.  E.L. told them that, on the day in question, he and two of his cousins, a boy and a girl, were at their grandmother's house.  E.L. recounted that the children played at a sand pit for several hours, that he prepared some rice for them to eat, that they resumed their play, and that they then went to his uncle's house.

When E.L. arrived at the point in his rendition placing him alone with his female cousin, he stated that he did not want to talk to the officers anymore and began to cry again.  At that point, E.L.'s mother got up and walked over to him.  She told him in Navajo that he should continue to cooperate with the investigation and that it would help him to clear his conscience.  She further stated that if he did speak, "whatever [was] ailing him inside would come out" and he would feel better.  She reassured him that it was "okay" for him to talk and cooperate with the investigators.  The officers did not participate in the conversation or encourage the mother's action in any way.

E.L.'s mother then asked if he would feel more comfortable talking to the officers if she left the room. After E.L. responded in the affirmative, both parents left the room. Agent Tanberg moved next to E.L. in the place previously occupied by the mother. At that time, as E.L. recalled at the suppression hearing, he was "scared" and "wanted to go." He could not, however, identify what scared him.

Agent Etsitty asked E.L. to continue where he had left off. The officers did not further advise him of his rights or question him about his desire to talk with them. In response to Agent Etsitty's statement that he should continue, E.L. said that he and his two cousins were watching television when the other boy left to use an outhouse some distance away. E.L. told the officers that during the time they were alone, he stood behind the girl and touched her breasts, worked his hands down between her legs, and put his finger into her vagina. Although E.L. continued to cry as he related these events, he did not ask to stop the interview. The discussion with E.L. out of the presence of his parents lasted about five to ten minutes; the officers' visit to the home lasted no more than one hour.

*B. The District Court Decision*

The district court ruled from the bench that E.L.'s statements to the officers were not voluntarily and knowingly made and could not, therefore, be used against him at trial. In reaching this conclusion, the district court recited at

length E.L.'s limited intellectual capacity and age. In particular, the district court noted that E.L.'s educational records placed him in a special education category of "borderline IQ." Furthermore, the district court concluded from observations in court that E.L. had only a minimal ability to understand what was occurring during the interview. Finally, the district court noted that E.L. was only thirteen at the time of the alleged incident and interview. Based on these factors, the district court concluded that E.L.'s "age combined with his academic deficiencies and his borderline IQ and my observations of his testimony here today persuade me that he simply did not understand his constitutional rights."

At the heart of the district court's conclusion that E.L.'s statements were not voluntarily made, however, is its conclusion that, without regard to whether E.L. was in custody, the officers were obligated to honor his indications that he wished to remain silent. The district court stated:

> I think the issue that is novel is whether, if the Court were to find that the setting was not a custodial setting, what happens when a defendant invokes a right to remain silent? What obligation is there? The government's position is that there is an obligation to cease questioning, but if questioning -- to cease questioning momentarily and not completely, and that's where I disagree. I think that once there is an invocation of one's right to remain silent, that the officer cannot simply rely, as was done here, on a mom's encouraging her son to speak, but has to speak to the defendant himself to ascertain at that point whether the defendant wishes to change his mind and to continue speaking to the officer. That's what was not done here, and quite frankly, that the area that I did some research on and could find no guidance.

I think that what I find so persuasive in this case is that [E.L.] said several times that he did not want to speak, and he was crying, and he is a child, and at that point, you know, the right to remain silent was unequivocally invoked, and we have Agent Etsitty basically saying, continue. That may be okay, it may not be. I mean, I wish there was some guidance, but my decision is that, in that context, [E.L.] did not voluntarily make a statement at that point, did not voluntarily waive his rights, did not understand them. We have a situation which he invokes them and they are not being respected, so there's no reason for him to believe that if he will continue to assert and invoke his constitutional rights that they will be honored.

Although the district court demonstrated some reluctance to rule on the issue, after some prodding from the United States, the district court also ruled that E.L. was in "custody" for *Miranda* purposes during the interview. Although the district court's findings related to the "in custody" determination are limited, it did state the custody "issue is a very close one for me. I think, under the context of this case, that [E.L.] perceived that he was -- that it was a custodial setting, and that -- and there were Miranda Rights that were given to [E.L.] by law enforcement." Upon further prompting by the United States, the district court specifically found that a reasonable person in E.L.'s position would have thought he was in custody.[2]

---

[2]It is undisputed that the officers here did administer *Miranda* warnings to E.L. Nevertheless, the district court specifically found that E.L.'s waiver of his rights under *Miranda* was not knowingly, intelligently, and voluntarily undertaken. The United States does not appeal this ruling. Instead, the heart of the United States' position on appeal is that E.L. was never in custody. Thus, according to the United States, E.L. was not entitled to *Miranda* warnings and a

(continued...)

### III. CUSTODIAL STATUS

*A. Standard of Review*

In *Cordoba v. Hanrahan*, 910 F.2d 691, 693 (10th Cir. 1990), this court held that a district court's ultimate "in custody" determination for *Miranda* purposes would be reviewed for clear error. The United States notes, however, that the Supreme Court's recent decisions in *Thompson v. Keohane*, 116 S. Ct. 457 (1995), and *Ornelas v. United States*, 116 S. Ct. 1657 (1996), call *Cordoba* into question. Accordingly, the United States invites this court to reconsider the proper standard of review for a district court's ultimate "in custody" determination. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (holding that a panel of this court cannot overrule circuit precedent absent a superseding contrary decision by the Supreme Court).

In *Thompson*, the Supreme Court granted certiorari to consider whether the presumption of correctness normally afforded by federal courts to state court factual determinations under 28 U.S.C. § 2254(d)[3] applied to a state court "in custody" determination. *See Thompson*, 116 S. Ct. at 462. The Court held that a

---

[2](...continued)
knowing and intelligent waiver of those warnings was not necessary. Accordingly, the only *Miranda* issue on appeal in this case is whether E.L. was in custody at the time of the interview.

[3]The provisions of § 2254(d) at issue in *Thompson* have been substantially revised by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.

state court's ultimate "in custody" determination was not entitled to a presumption of correctness because the issue was legal rather than factual in nature. *Id.* at 465-67. According to the Court,

> The ultimate "in custody" determination for *Miranda* purposes, we are persuaded, fits within the latter class of cases [involving questions of law]. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d). The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

*Id.* (citations and footnote omitted).

The Court went on to note that a "trial court's superior capacity to resolve credibility issues is not dispositive of the 'in custody' inquiry" because "the crucial question entails an evaluation made after determination of those circumstances: if encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined by *Miranda*?" *Id.* at 465, 466. Finally, unlike questions of juror bias and the defendant's competency in which a trial court makes an "individual-specific" decision "unlikely to have precedential

-10-

value," the Court noted that "'in custody' determinations do guide future decisions." *Id.* at 466. Accordingly, once the historical circumstances are established, a state trial court is in no different position than a federal district court in determining whether a defendant is in custody for *Miranda* purposes. *See id.* Applying the same reasoning and analysis, the federal district court determination, like the state court decision, then, should be reviewed *de novo*.

E.L. argues that *Thompson* is distinguishable on the grounds that it dealt with the interaction between state and federal courts in the habeas corpus setting rather than the degree of deference this court must afford, on direct appeal, to a federal district court's "in custody" determination. *Thompson*, however, cannot be minimized by pigeonholing it as a procedural ruling for federal habeas review of state court decisions. A careful reading of the opinion reveals the basis of *Thompson* is that resolution of custody is ultimately a mixed question of fact and law to be reviewed *de novo*. *See id.* at 465-66; *see also Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1991) ("In both direct and collateral review, the question whether the trial court's determination is factual or legal is the same.").

In *Ornelas*, the Supreme Court held that Courts of Appeals must review *de novo* a district court's determinations of reasonable suspicion and probable cause. *See Ornelas*, 116 S. Ct. at 1662. As in custody determinations, the Court noted that determinations of reasonable suspicion and probable case entail two discrete

inquiries: what events "occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause." *Id.* at 1661-62. The court further characterized these discrete inquiries as follows:

> The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

*Id.* at 1662 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).

The Court identified three important policies underlying its conclusion that the Courts of Appeals should utilize a *de novo* standard when reviewing the application of law to established historical fact in the context of a reasonable suspicion or probable cause determination. First, "[a] policy of sweeping deference would permit, '[i]n the absence of any significant difference in the facts,' 'the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause.' Such varied results would be inconsistent with the idea of a unitary system of law." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 171 (1949)). Second, the court noted that legal rules "acquire content only

through application." *Id.* Accordingly, "[i]ndependent review is . . . necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Id.* Finally, "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined" set of rules to follow. *Id.* It is these same policies, although more subtly stated, which informed the *Thompson* decision that an "in custody" determination is a legal determination not entitled to a presumption of correctness on habeas corpus review. *See Thompson*, 116 S. Ct. at 465-66.

Taken together, *Thompson* and *Ornelas* establish that when reviewing a district court's application of law to established historical fact, as in the "in custody" determination at issue here, Courts of Appeals must employ a *de novo* standard. *See United States v. Yusuff*, 96 F.3d 982, 987-88 (7th Cir. 1996) (holding that *Ornelas* and *Thompson* mandate that a district court's "in custody" determination be reviewed *de novo*); *see also United States v. Fernandez-Ventura*, 132 F.3d 844, 846 (1st Cir. 1998) (citing *Thompson* and *Ornelas* for proposition that "in custody" determination is "mixed question of fact and law, subject to de novo review" in federal prosecutions); *United States v. Howard*, 115 F.3d 1151, 1154 (4th Cir. 1997) (citing *Ornelas* for same proposition). Because the standard of review set forth by the court in *Cordoba* is contrary to the Supreme Court's superseding decisions in *Thompson* and *Ornelas*, *Cordoba* is not binding on this

panel. *Smith*, 10 F.3d at 724. Accordingly, we review the district court's

ultimate "in custody" determination *de novo*, with proper deference to the district

court's findings of historical fact and credibility determinations. *Ornelas*, 116 S.

Ct. at 1663; *Thompson*, 116 S. Ct. at 464.

*B. Analysis*

It is well established that "police officers are not required to administer

*Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429

U.S. 492, 495 (1977). Instead, the warnings mandated by *Miranda* apply only to

"statements obtained from an individual who is subjected to custodial police

interrogation." *Miranda*, 384 U.S. at 439. The relevant question is whether E.L.

was in custody for *Miranda* purposes during the interview at E.L.'s home.

In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the Supreme Court held that

a suspect is not "in custody" for purposes of *Miranda* unless his "freedom of

action is curtailed to a 'degree associated with formal arrest.'" *Id.* at 440 (quoting

*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). The proper

perspective for determining whether a suspect is in custody at the time of

questioning is whether "a reasonable [person] in the suspect's position would

have understood his situation . . . as the functional equivalent of formal arrest."

*Id.* at 442. *Berkemer*'s "reasonable person" does not have a guilty state of mind

and does not have peculiar mental or emotional conditions that are not apparent to

-14-

the questioning officer. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) (noting that law's reasonable person is innocent); *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc) ("[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test . . . 'other than to the extent that they may have been known to the officer and influenced his conduct.'" (citation omitted)).

Before this court proceeds to the application of that standard to the historical facts in this case, it is necessary to make one further observation. In evaluating whether E.L. was in custody, only the restraint imposed by the officers is a relevant consideration. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)); *see also United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997); *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir 1987) (holding that Cochiti Pueblo Indian's desire to attend interview so as not to insult the Pueblo Governor did not convert interview into custodial setting). Neither the district court's findings nor record inferences suggest that E.L.'s parents were acting on behalf of the officers or in any capacity other than a parental one. Consequently, whatever assumed moral or

psychological pressures flowed from their encouragement of cooperation are irrelevant to the analysis of whether E.L. was in custody.

We conclude that the actions of the officers in this case would not cause a reasonable person in E.L.'s position to believe that his liberty was restrained to the degree associated with formal arrest. The atmosphere surrounding the interrogation here was far from the type of "police-dominated" atmosphere identified as custodial in *Miranda*. *Miranda*, 384 U.S. at 445, 456. The officers here called ahead and indicated that they wished to speak to E.L. about a possible sexual abuse. The plain-clothed officers arrived at the residence in an unmarked car at approximately 3:00 in the afternoon. The officers were welcomed onto the property by E.L.'s father and escorted into the home by both the father and mother. The parents introduced E.L. to the officers and the officers, parents, and E.L. all proceeded to the living room for the interview. *See United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) ("'[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." (quoting 1 W. LaFave, *Criminal Procedure* § 6.6(e), at 496 (1984 & Supp. 1991)). The record indicates, and the district court did not make a contrary finding, that the officers were well-mannered and courteous and that they did not adopt a threatening posture or make a show of physical force.

The officers then explained the purpose for the visit,[4] informed E.L. that he was not under arrest and would not be arrested no matter what he said, and specifically asked the parents' and E.L.'s permission to conduct an interview. In fact, the officers spent several minutes explaining E.L.'s *Miranda* rights in both English and Navajo. E.L. signed a waiver of his rights and the parents signed the waiver form as witnesses.[5] At least one of the parents remained in the room throughout much of the interview and, when E.L. grew silent or specifically indicated that he wanted to remain silent, occasionally encouraged E.L. to cooperate with the officers to "clear his conscience." E.L.'s parents left the room only after E.L.'s mother again encouraged E.L. to unburden his conscience and E.L. agreed that he could talk more freely about the incident if his mother left the room.

---

[4]The mere fact that the officers were focusing on E.L. as the primary suspect in the sexual abuse case does not transform the interview into a custodial interrogation. *United States v. Chalan*, 812 F.2d 1302, 1306 (10th Cir. 1987).

[5]As this court recently noted, "giving a *Miranda* warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation." *United States v. Bautista*, No. 97-2222, 1998 WL 261406, at *7 (10th Cir. May 22, 1998). The giving of those warnings is, however, a factor to be considered by this court. *See id.* In the context of this case, we do not believe that the provision of *Miranda* warnings to E.L. served to transform a noncustodial setting into a custodial interrogation. If anything, the warnings here merely served to inform E.L. that the officers could not and would not force him to answer their questions. *See United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (noting that extent to which defendant is informed he is free to refrain from answering questions "will often define[] the custodial setting").

Given these facts, a reasonable juvenile in E.L.'s position would not have believed that the officers had curtailed his freedom of movement to a degree associated with formal arrest. *See Berkemer*, 468 U.S. at 442. The environment was not police-dominated, the officers were courteous and non-threatening, E.L. was specifically informed that he had the right to refuse to answer the officers' questions, and E.L. and his parents were told that E.L. would not be arrested regardless what he said. Nevertheless, E.L. argues that the district court's finding that he was in custody for *Miranda* purposes must be affirmed because "[a] child with [E.L.'s] characteristics would reasonably feel unable to leave or to request that officers leave under the circumstances in which [E.L.] found himself." This argument represents a basic misunderstanding of the nature of the inquiry under *Berkemer*. Although the district court did make extensive findings with regard to E.L.'s limited capacity to understand and other particular personality traits, those particular traits are not relevant under the objective standard applicable here unless the officers were aware of E.L.'s particular traits **and** those traits influenced the actions of the officers. *See Little*, 18 F.3d at 1505. Because the district court did not find that the officers were aware of E.L.'s particular traits or that the officers adjusted their tactics in response to E.L.'s idiosyncracies and because neither of those findings can be fairly inferred from the record, E.L.'s

-18-

idiosyncracies are not relevant to this court's determination of whether he was in custody for *Miranda* purposes.

Finally, to the extent that E.L.'s brief can be read as inviting this court to reach out to create a dual track for "in custody" determinations by making such determinations objective when the suspect is an adult but subjective when the suspect is a child, we decline the invitation. Not only is it unwise to place such a burden on law enforcement, but such an approach is directly contrary to the approach adopted by the Supreme Court. *See Berkemer*, 468 U.S. at 442 n.35 (noting that a reasonable person test is "appropriate because, unlike a subjective test, 'it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question'" (quoting *People v. P.*, 233 N.E.2d 255, 260 (N.Y. 1967)).

Because a reasonable person in E.L.'s position would not have believed that he was subjected to the functional equivalent of formal arrest, this court reverses the district court's conclusion that E.L. was in custody for *Miranda* purposes.

## IV.  THE CONFESSION

### A.  Standard of Review

The United States also challenges the district court's conclusion that E.L.'s statements were not voluntarily given.  "When a defendant challenges the use of [his] statements on the ground that they were involuntary, it is the duty of this court 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Glover*, 104 F.3d at 1579 (quoting *Davis v. North Carolina*, 384 U.S. 737, 741-42 (1966)).  Nevertheless, the district court's subsidiary factual determinations are subject to review for clear error.  *See id.* at 1580.

### B.  Analysis

In evaluating the voluntariness of a confession, this court considers "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  The test is whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.  *See Glover*, 104 F.3d at 1579.  In considering whether a particular confession is coerced, this court considers the following factors: "(1) the age, intelligence, and education of the defendant; (2) the length of [any]

detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *Id.*

The totality of the circumstances test used to determine the voluntariness of a confession was clarified and refined by the Supreme Court in *Connelly*. In *Connelly*, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167. The Court went on to emphasize that in the confession cases it had decided over the previous fifty years, the "crucial element" had been the presence of "police overreaching." *Id.* at 163. Accordingly, it is clear after *Connelly* that a confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will.

As detailed above, the district court made detailed findings regarding E.L.'s age and personal characteristics and ultimately concluded that E.L. was particularly susceptible to police coercion. The district court further found that E.L. was distraught throughout the interview and did not fully understand the nature of his constitutional rights. Although these findings are troubling, they are not determinative. As aptly noted by the Eighth Circuit, "*Connelly* makes it clear that . . . personal characteristics of the defendant are constitutionally irrelevant

absent proof of coercion." *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987) (internal quotations omitted); *see also Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1991) (citing *Rohrbach*). Thus, E.L.'s age, mental capacity, and personal idiosyncracies are relevant only if this court first concludes that the officers' conduct was coercive. *See Derrick*, 924 F.2d at 818.

To satisfy this required element of police coercion, E.L. relies on the district court finding that after E.L. told the officers several times that he did not want to speak, they proceeded to question him further. With this finding in mind, the district court concluded that "there's no reason for [E.L.] to believe that if he will continue to assert and invoke his constitutional rights that they will be honored." In light of this finding, E.L. asserts that it was "[t]he officers' failure to honor [E.L.'s] attempt to stop questioning [that] overbore his will and exploited his extreme vulnerability." Upon review of the totality of the circumstances, we conclude that the officers' actions in this particular case were not coercive and, to the extent that E.L.'s free will was overcome, it was the actions of E.L.'s parents that led to the confession. *See id.* at 818-19 (holding that whether actions of law enforcement were coercive is part of the totality of the circumstances subject to *de novo* review).

Three witnesses testified at the suppression hearing: E.L., E.L.'s father, and Agent Etsitty. As noted by the district court, the testimony of the three is

consistent in all critical respects.  As noted above, the officers were well-mannered and courteous and did not adopt a threatening posture or make a show of physical force.  The interview was conducted in E.L.'s home with the express permission of E.L.'s parents.  The record demonstrates that E.L. was uncommunicative during much of the interview and that his parents both encouraged him to speak to the officers on several occasions.  The record also reveals that the officers patiently and methodically informed E.L. of his constitutional rights in both Navajo and English and again informed him that he was not in custody and would not be arrested.  In light of the parental encouragement and the assurances of the officers, E.L. began to recite some background information about the events in question.  As E.L. reached the critical point in the recitation, he stopped and specifically informed the officers that he no longer wished to speak to them.[6]

As to this critical juncture, Agent Etsitty testified as follows:

> Agent Etsitty: Then he stops there, and I believe he said that he didn't want to talk to us anymore about it.

---

[6]This court has reviewed the entire transcript of the suppression hearing and notes that although E.L. was uncommunicative during much of the interview, there is no testimony that E.L. specifically invoked his right to remain silent on any other occasion either prior to or after this critical juncture.  Accordingly, to the extent the district court found that E.L. had specifically invoked his right to silence on several occasions and that those invocations had been ignored by the officers, that finding is without support in the record and is clearly erroneous. *See Exxon Corp v. Gann*, 21 F.3d 1002, 1005 (10th Cir. 1994).

Counsel: Okay. Did you change your posture in any way after he said he didn't want to talk about it anymore?

Agent Etsitty: No.

Counsel: What did you do?

Agent Etsitty: I just sat there, paused, looked down.

Counsel: Then what happened?

Agent Etsitty: The mother walked over to him and -- to tell her son to continue to cooperate with the investigation and this will help him clear his conscience, whatever is ailing him inside would come out. He'll feel better. This went on a couple minutes, to three minutes. I just sat there and listened on.

. . . .

Counsel: And what was the mother's demeanor and expression?

Agent Etsitty: She [was] reassuring him that it's okay for him to talk about it, it's okay for him to cooperate with the investigation and to tell his side of the story. It will make him feel better. She emphasized that throughout from the beginning to the time she left.

. . . .

Counsel: During this two to three minutes that the mother was talking to her son, what were you doing?

Agent Etsitty: I sat, you know, right across from them where I was at and listened.

Counsel: Did you participate in any way in the conversation between the mother and the son?

Agent Etsitty: No.

Counsel: Did you encourage the mother's position or discourage it?

Agent Etsitty: No.

. . . .

Counsel: Okay. Then what happened?

Agent Etsitty: The mother asked [E.L.] that -- if he would feel comfortable him talking to us if she leaves the room.

Counsel: Did he respond?

Agent Etsitty: Yes, he did.

Counsel: What did he say?

Agent Etsitty: He said yes.

Counsel: And then what happened?

Agent Etsitty: She went off into the back of the room, you know, through the kitchen, down the hall.

-24-

. . . .

Counsel: Okay.  How did you conduct the interview after the mother left?

Agent Etsitty: I, basically, told him to continue on where he left off.

Counsel: And did he?

Agent Etsitty: Yes.

E.L.'s father testified about this critical juncture as follows:

Counsel: Okay.  When he was crying and the tears were running down his face, did you hear your wife saying anything to him?

Father:  Yes.  I remember my wife asking my son to go ahead and explain what the officers wanted and to not hold anything back.

Finally, E.L. testified as follows:

Counsel: And you started to cry, and you said you didn't want to talk about it anymore; isn't that right?

E.L.: Yes.

Counsel: And isn't it true that your mom got up and came over to you?

E.L.: No. She was sitting beside me.

. . . .

Counsel: And didn't she talk to you while you were crying?

E.L.: Yes

Counsel: And didn't she tell you that you ought to keep talking, that you ought to get it off your chest and clear your conscience and tell them what happened and tell them the truth? Didn't your mom tell you all that?

E.L.: Yeah.

. . . .

Counsel: What did you say when your mom said you ought to talk to the officers?

E.L.: I don't remember.

Counsel: You don't remember.  Didn't your mom tell you it would be better for you to get it off your chest?

E.L.: I think so.

. . . .

-25-

Counsel: Didn't you stop crying because your mom talked to you and your mom patted you and comforted you and told you that you needed to get it off your chest and just tell the truth? Isn't that the real reason you stopped crying?
E.L.: Yes.
Counsel: And you decided to go ahead and take your mom's advice, didn't you?
E.L.: Yes.

In light of this consistent testimony from the three critical witnesses, this court concludes that none of the actions of the officers were coercive. After E.L. invoked his right to silence, the officers ceased questioning. On her own initiative, E.L.'s mother engaged him in conversation and indicated that he should speak with the officers to clear his conscience. Furthermore, apparently realizing that the subject could be a difficult one for a son to discuss in the presence of his mother, she asked E.L. if he could talk more freely if she left the room. After the mother left the room, the officers turned to E.L. and said "continue." E.L. then confessed to sexually abusing his cousin. Because none of the actions of the officers were coercive, E.L.'s confession is voluntary for purposes of the Fifth Amendment. *See Connelly*, 479 U.S. at 167 ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' withing the meaning of the Due Process Clause . . . ."); *Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996) (holding that even in cases where a defendant is mentally impaired and the officer was aware of the impairment, a confession will

be suppressed as involuntary only if the officers utilize coercive measures to take advantage of the impairment).[7]

To the extent that E.L.'s will was overborne, it was overborne by the actions of his parents rather than the actions of the officers. This type of non-government pressure does not render a confession involuntary. *See Commonwealth v. Doe*, No. 87-1108, 1988 WL 31904 at *4 (9th Cir. March 31, 1988) (unpublished disposition) (holding that responses to police questions coerced by a parent are not involuntary as that term has been defined in *Connelly*); *see also supra* page 16 (noting that neither the district court's findings nor record inferences suggest that E.L.'s parents were acting on behalf of the officers or in any capacity other than a parental one).

Finally, under the totality of the circumstances surrounding this case the officers' simple statement to E.L. to "continue" after his mother left the room cannot be considered coercive. Nor were the officers under a constitutional obligation to dissipate any coercion E.L. may have experienced as a result of the desire of his mother that he cooperate with the officers. Accordingly, in light of the conversation between E.L. and his mother in the officers' presence and in light of E.L.'s non-custodial status, the officers were not obligated to re-

---

[7]This court has also considered the factors set out in 18 U.S.C. 3501(b) and concludes that they are satisfied given the totality of the circumstances in this case.

-27-

Mirandize E.L. or engage him in further discussion regarding his willingness to speak after his mother left the room.

Because E.L.'s confession was not the product of police coercion, the district court erred in excluding the confession as involuntary.

## IV. CONCLUSION

The district court's suppression order is hereby **REVERSED** and the case is **REMANDED** to the district court for further proceedings.