**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee

v.

ALFRED J. ELLICK

        Defendant - Appellant.

No. 97-2163

D. New Mexico

(D.C. No. CR-96-220-JC)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **MCKAY**, and **EBEL**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Alfred J. Ellick appeals his conviction for conspiracy to possess methamphetamine with intent to distribute and aiding and abetting, violations of

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3

21 U.S.C. § 846 and 18 U.S.C. § 2, for which he was sentenced to 151 months imprisonment. He contends (1) that there was a prejudicial variance between the indictment and the government's proof at trial; (2) that hearsay and illegally obtained evidence were improperly introduced; and (3) that his motion to sever defendants was improperly denied. He also challenges his sentence, contesting both the district court's drug quantity calculation and its denial of his motion for a downward departure. We reject each of Ellick's claims, and affirm both his conviction and his sentence.

## I. BACKGROUND

Ellick's conviction stems from drug trafficking activities in California and New Mexico. In Count I of a five-count indictment, he and ten codefendants were charged with conspiring "together and with each other and with other persons" to "[p]ossess[] with intent to distribute 1 kilogram and more" of a substance containing methamphetamine. R. Vol. I, Tab 43. In this count the indictment named Ellick, Christopher Lee, Ulysses Harper, Bryant Marshall, Melanie Young, Ricardo Vera, Michael Clark, Joe Altamirano, Mary Sanchez, Burch Woody McCoy, and Kenneth Brown.[1] Ellick, Harper, Marshall, McCoy,

---

[1]Ellick was charged in Count II with possession of methamphetamine, but this charge was later dismissed. He was not named in Counts III-V.

and Altamirano were tried together. At trial, Clark, Young, and Brown testified for the government pursuant to plea agreements. At the time of trial, Lee and Sanchez were fugitives.

We first summarize the evidence of a conspiracy to distribute methamphetamine, and then review the evidence which specifically implicates Ellick.

## A. Evidence of Conspiracy

At trial, evidence of drug trafficking focused on four episodes, each involving a quantity of methamphetamine and various codefendants. Ellick was not present at any of these events, but as we will subsequently explain, Ellick was tied to them by other evidence.

### 1. Five Pounds of Methamphetamine Confiscated in San Bernardino

In late 1994 or early 1995, the Drug Enforcement Agency (DEA) began receiving information about a possible methamphetamine distribution ring in Roswell, New Mexico. Through a series of tips and cooperative law enforcement efforts, Christopher Lee and Ulysses Harper were apprehended in San Bernardino, California on June 14, 1995, as they prepared to take an Amtrak train to Albuquerque. Lee and Harper identified themselves as Christopher Lee and

Larris Slaton (one of Harper's aliases). After initial questioning, officers obtained Lee and Harper's consent to search their persons and luggage.

In their search of Harper and his luggage, officers discovered a gift-wrapped package containing five pounds of methamphetamine. (Harper's fingerprint was later found on the package.) They also found a handgun, a "pay/owe" accounting sheet, $4,800 in cash, and a black address book. The address book listed Ellick's phone number next to the initials "A.J." In addition, officers discovered that Lee and Harper were each carrying a small canister of pepper spray. They were both arrested and were later released from custody.

Further investigation revealed that on this trip Harper rented a hotel room using an identification card issued to him with the address of 83 Holman in Roswell, New Mexico–Ellick's residence. Baxter Jones (under separate indictment) testified under a plea agreement that both he and Ellick were to have received a portion of the confiscated methamphetamine. Michael Clark testified that Ricardo Vera told him about the loss of the drugs. Bryant Marshall testified that he drove Lee and Harper to the train station in Albuquerque for the first leg of the trip.

**2. One Pound of Methamphetamine Delivered to Young's Residence**

In April 1996, Federal Express employees in Memphis, Tennessee intercepted one pound of methamphetamine in a package addressed to Melanie Young in Alamogordo, New Mexico. It had been mailed by "C.Y. Rodriquez" from "Mail Plus" in Ontario, California. Vera lived in Ontario. On April 4, 1996, a DEA agent posing as a Federal Express employee delivered the package while other agents surveilled the residence. Young signed for the package and the undercover agent left. Then the other agents surrounded and searched the house pursuant to a warrant. Lee and Marshall were also at the residence and unsuccessfully tried to flee. Evidence recovered from the residence included the package, a pistol, a book containing phone numbers for Marshall and Lee, a slip of paper with the name "C.Y. Rodriquez" and the phone number of Vera, and photographs of Harper and Lee. Officers also found two letters from Harper to Young, sent from jail in Arizona, dated February and March 1996.

**3. Woodson's Purchase of Methamphetamine from Vera via Clark**

After the events at Young's residence, DEA agents interviewed Christopher Lee. Lee cooperated with the agents and on May 1, 1996, he gave his pager to Agent Steven Woodson. Later that day, Woodson received pages from Vera and Altamirano. Woodson then began posing as one of Lee's distributors. He spoke

with Vera by telephone and arranged a methamphetamine purchase. DEA agents wired over $2,000 to Vera and Clark, and Clark delivered six ounces of methamphetamine to undercover DEA agents in Roswell, New Mexico on June 6, 1996.

### 4. Woodson's Purchase from Altamirano, McCoy, Sanchez, and Brown

After receiving Altamirano's page, Agent Woodson called him to arrange an undercover drug purchase. Altamirano asked agents to wire money to him (in Burch Woody McCoy's name) in Ontario, California, as a show of good faith. They wired at least $900, and Altamirano confirmed receipt of the money, promising a delivery in Albuquerque, where he claimed to have other distributors. On June 14, 1996, Altamirano, Brown, Sanchez, and McCoy met with Woodson and other DEA agents in Albuquerque, and delivered methamphetamine in exchange for $2000. All four were then arrested.

### B. Evidence Linking Ellick To Methamphetamine Distribution

At trial, the government presented evidence linking Ellick to the drug trafficking activities detailed above, including dealings with Lee, Vera, Altamirano, Harper, and others. Michael Clark, testifying under a plea agreement, stated that he knew Ellick as one of a number of people who had

traveled to California and stayed at Vera's home in Ontario, people to whom Vera sold drugs, whom Vera called "big money." Trial Transcript (Tr.) at 409. Clark testified that these people included not only Ellick but Lee, Harper, and Marshall. The government also presented receipts from various wire transfers, including one from Ellick to Vera ($90, no date specified), one from Lee to Harper ($899, dated December 1994), two from Marshall to Vera (both undated), and one from Vera to Altamirano (dated January 1996).

The most direct evidence against Ellick was the testimony of Agent Woodson. According to Woodson, DEA agents and other law enforcement officers executed a search warrant at Ellick's residence on May 30, 1996. During the search, Woodson and one other officer asked Ellick if they could talk to him. Ellick stated that he had a doctor's appointment; the officers told him he was free to go to it. They informed Ellick that he was not under arrest and that he would not be arrested that day. Ellick stated that he did not want to go to his doctor's appointment, and then walked the officers to his backyard and sat down with them. Woodson further testified that the officers did not coerce or threaten Ellick and that no guns were drawn.

According to Woodson's testimony, Ellick admitted to being involved with Christopher Lee and others in the distribution of methamphetamine. Ellick told the officers he had traveled four or five times between California and Roswell and

had delivered a total of approximately 14 ounces of methamphetamine. He told the officers that he had purchased cell phones for drug couriers and that he had purchased a pager for Lee. He stated that he and Lee had stayed at Vera's residence in California. Woodson further testified that Ellick admitted to having stolen scales from Lee. Ellick told the officers that Lee believed Ellick owed him $1500 for previously distributed methamphetamine. The district court denied Ellick's pretrial motion to suppress Woodson's testimony regarding these statements.

Officers executing the search warrant found physical evidence linking Ellick to drug trafficking. They found a handwritten transaction record detailing exchanges of "grams" placed in "bags" for dollar amounts, involving "Mr. E," "Mr. P," and "Marshall." (Christopher Lee used "Pimp" as a nickname.) For example, "In California, Mr. E. gave Mr. P. $1,000 in $100 bills for the balance of Monday, January 15, 1996, pickup of 12 grams." Tr. at 355. One entry denotes a $3,400 transfer from "Mr. E" to "Mr. P." Id. Officers also found a handgun. They obtained telephone records for Ellick's residence documenting phone calls to Ricardo Vera's pager, as well as a $3,240 cellular telephone bill.

Other evidence found in Ellick's residence linked Ellick with Harper. Officers found a receipt in the name of Larris Slaton (one of Harper's aliases), as well as a photograph of Harper matching one found in Young's residence. They

found a handwritten letter from Ellick to a state judge on behalf of Harper, stating "Ulysses has lived with me and my family for the last four years. He has been a positive influence on us all." Tr. at 352. Investigators had previously linked Ellick to Harper when they found Ellick's address on the ID card used by Harper at Travelodge in San Bernardino, and Ellick's phone number in Harper's address book.

Prior to trial, the court held a competency hearing and determined that Ellick was competent to stand trial. At trial Ellick was convicted of Count I, and he was later sentenced to 151 months imprisonment.

## II. DISCUSSION

### A. Variance

Ellick argues that there was a variance between the indictment, which alleged a single conspiracy, and the government's proof at trial, which Ellick claims showed multiple conspiracies. Where a single conspiracy is charged in the indictment but the government proves only multiple conspiracies, a defendant who is thereby substantially prejudiced is entitled to a reversal of his conviction. See Kotteakos v. United States, 328 U.S. 750, 773-74 (1946); United States v. Edwards, 69 F.3d 419, 432 (10th Cir. 1995). Where, as here, a jury determines

that a single conspiracy was proven at trial, "we review the jury's decision in a light most favorable to the government." Edwards, 69 F.3d at 432.

Under this deferential standard, we conclude that the government proved a single conspiracy. The evidence showed a large-scale operation run by Vera and Altamirano. This operation utilized various distributors and retailers, and included all the persons named in Count I of the indictment. Although not all these participants knew each other, "[w]here large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." United States v. Watson, 594 F.2d 1330, 1340 (10th Cir. 1979). Ellick's own statements and the physical evidence gathered at his house overwhelmingly implicate Ellick in this conspiracy. Ellick's handling of large quantities of methamphetamine can reasonably be inferred from the transaction record found at his house, as well as from the testimony of his direct dealings with Lee, Harper, Vera, Clark, and Marshall. The jury could reasonably infer that Ellick belonged to one branch of what he must have known to be an extensive illegal operation with multiple branches.

**B. Ellick's Statements to Officers at his Residence**

Ellick argues that his conversation with law enforcement officers at his residence constituted custodial interrogation in violation of his Fifth Amendment rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). He further argues that his statements were involuntary. Ellick made both of these arguments in a pretrial suppression motion; it was denied by the district court after an evidentiary hearing where the court heard testimony from Agent Woodson and Mr. Ellick. The court determined that Woodson was credible and that Ellick was not credible. The court held that Ellick was not "in custody" when he made the statements and that therefore <u>Miranda</u> did not apply. The court made no specific finding as to voluntariness. Ellick later renewed the motion and it was denied without further findings.

### 1. <u>Miranda</u>

Whether Ellick was "in custody" for purposes of <u>Miranda</u> is a legal issue which we review <u>de</u> <u>novo</u>, "with proper deference to the district court's findings of historical fact and credibility determinations." <u>United States v. Erving L.</u>, 147 F.3d 1240, 1246 (10th Cir. 1998). A person is "in custody" for purposes of <u>Miranda</u> only if "a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest." <u>Id.</u> at

-11-

1246-47 (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)) (internal quotes and alterations omitted).

Because the district court determined that only Agent Woodson was credible, we refer to his testimony. Woodson testified that officers repeatedly told Ellick that he could leave at any time and that he was not under arrest. They recommended that he go to his doctor's appointment if that was what he wanted to do. No officers drew guns and none were in uniform. A reasonable person might hesitate to leave when law officers are searching his house, but after being told that he could leave and that he would not be arrested that day, he would not perceive the situation as tantamount to formal arrest. Therefore Ellick was not "in custody" and his statements were properly admitted.

## 2. Voluntariness

A determination of voluntariness is based on the totality of the circumstances. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>United States v. Perdue</u>, 8 F.3d 1455, 1466 (10th Cir. 1993). "We examine several factors including the characteristics of the suspect, such as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force." <u>United States v. Nguyen</u>, 155 F.3d 1219,

1222 (10th Cir. 1998). Because the district court did not make specific findings on the issue of voluntariness, we must uphold its ruling "if there is any reasonable view of the evidence to support it." United States v. Morgan, 936 F.2d 1561, 1565 (10th Cir. 1991).

We conclude that there is evidence to support the district court's ruling. While Ellick claims to be of "less than average intelligence," Reply Br. at 3, according to Woodson, Ellick gave detailed statements that were corroborated by several other persons investigated. Although Ellick testified that he was taking numerous medications at the time, Woodson stated that Ellick was "[c]oherent, competent, [and] understood exactly what the questions were and the answers. He would state certain things, and then other things he would hedge on." Supp. Tr. at 7. Woodson testified that although Ellick was never informed of his rights and even though he spoke with Ellick for about an hour, there were no threats of force. Under these circumstances Ellick's statements can reasonably be viewed as voluntary and we therefore refuse to disturb the district court's ruling.

## C. Hearsay Statements of Lee

Ellick argues that the district court wrongly denied his motion in limine to exclude statements made by Christopher Lee to interviewing officers, and that these hearsay statements were improperly introduced at trial. This claim is

without merit.  Contrary to Ellick's assertion in his opening brief, Agent Woodson did not testify at trial to the details of his interviews with Lee.  Ellick points to only one hearsay statement by Lee which was admitted at trial:  Lee's corroboration of Ellick's statement about a supposed debt to Lee.[2]  Ellick's attorney did not object to the admission of this statement and therefore we review its admission only for plain error.  See United States v. Cass, 127 F.3d 1218, 1225 (10th Cir. 1997).

Ellick's claim fails because he cannot show an obvious and substantial error which deprived him of the right to a fair and impartial trial.  See United States v. Nieto, 60 F.3d 1464, 1467 (10th Cir. 1995).  The challenged statement was only a small piece of corroborating evidence presented in the context of

---

[2][United States' Direct Examination of DEA Agent Woodson:]

Q:    . . . [W]as there anything that Mr. Ellick told you that you found to be corroborated by other sources?

A:    Yes, ma'am.

Q:    Can you give us an example of that.

A:    Well, his statement to us about being owed 150–or that Mr. Lee believed he owed $1500 was exactly what Mr. Lee had told us.

Tr. at 536.

overwhelming evidence of guilt, including Ellick's own admissions. It did not affect the fairness of the trial in any substantial way.

In his reply brief, Ellick appears to contest the admission of hearsay before the grand jury. This argument was not raised in his opening brief and we therefore will not consider it. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

## D. Severance

Ellick contests the district court's denial of his motion to sever. Counsel for Ellick filed three such pretrial motions, making distinct arguments in each. All three were denied. Ellick does not specify which of the denials he is appealing. However, from the arguments in his briefs we conclude it is only his "Motion to Sever Defendants" filed January 15, 1997. Ellick argues that the district court's failure to sever deprived him of the opportunity to elicit exculpatory testimony from Harper, and to confront Lee regarding Lee's alleged statements to Woodson.

We review the denial of a motion to sever for abuse of discretion. United States v. Lopez, 100 F.3d 113, 119 (10th Cir. 1996). Ellick bears the "heavy burden" of showing "actual prejudice" from the failure to sever. Id.; see also Zafiro v. United States, 506 U.S. 534, 539 (1993) (discussing examples of

prejudice). More specifically, "when the accused's asserted reason for severance is the need for the testimony of a codefendant, he must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving defendant." United States v. Dickey, 736 F.2d 571, 590 (10th Cir. 1984).

Ellick has offered only his bare assertions that Harper and Lee would have testified in his favor at a severed trial. We cannot so easily conclude they would have waived their Fifth Amendment privileges. Furthermore, Lee was a fugitive at the time of trial, and Ellick has not told us how he would have secured Lee's testimony in his favor. Ellick's hopeful, unsupported assertions fall short of establishing "actual prejudice."

## E. Amount of Methamphetamine Attributed to Ellick at Sentencing

Ellick argues that he was improperly sentenced for the five pounds of methamphetamine seized from Harper and Lee as well as the one pound seized at Young's residence. The sentencing judge calculated Ellick's sentence based on a quantity of "at least 2.704 net kilograms of methamphetamine," Sent. Tr. at 7, or approximately six pounds. This was the same quantity indicated in the presentence report.

We review a district court's drug quantity calculation for clear error. "[W]e will not disturb it unless it has no support in the record, or unless after reviewing all the evidence we are firmly convinced that an error has been made." United States v. Edwards, 69 F.3d 419, 438 (10th Cir. 1991). In a drug conspiracy case, a district court calculates a defendant's base sentence level using not only the quantity with which he personally dealt, but also any amounts "which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators." United States v. Ivy, 83 F.3d 1266, 1289 (10th Cir. 1996). The government bears the burden of showing this quantity by a preponderance of the evidence, using evidence with at least a "minimum indicia of reliability." United States v. Cruz Camacho, 137 F.3d 1220, 1225 (10th Cir. 1998).

The evidence supports Ellick's sentence. Baxter Jones testified at trial that Ellick was to have received part of the methamphetamine seized from Harper and Lee. In addition, there was extensive evidence that Ellick had distributed drugs obtained from Lee, including Ellick's own statements. The presentence report indicates that Ellick provided money for both packages of seized drugs. It also indicates that shortly after the arrests at Young's residence, Young telephoned Ellick's residence and spoke with his wife about the pound of methamphetamine seized. Ellick offered no witnesses or evidence at sentencing, and he has given us

-17-

no reason to conclude that the government's evidence was not sufficiently reliable.


## F.  Downward Departure

Ellick argues that the district court improperly denied his motion for a downward departure.  We will not review the denial of a downward departure "unless the judge's language unambiguously states that the judge does not believe he has authority to downward depart."  United States v. Rodriguez, 30 F.3d 1318, 1319 (10th Cir. 1994).  Prior to sentencing, Ellick submitted a written motion requesting a downward departure.  At sentencing, the judge stated, "I have read your Motion for Downward Departure and find it to be without merit."  Sent. Tr. at 3.  As we read it, this statement implies that the judge believed he had authority to grant the motion, but chose to deny it after considering the merits.  Never did the judge unambiguously indicate that he believed he lacked authority to grant the motion.  Therefore we will not review his decision.


## G.  Competency and Ineffective Assistance of Counsel

Ellick's supplemental brief appears to argue both that he was incompetent to stand trial and that he was denied the effective assistance of counsel.  As to the competency issue, we have reviewed the transcript of the competency hearing and find that the court's determination that Ellick was competent to stand trial was not

clearly erroneous or arbitrary. See United States v. Crews, 781 F.2d 826, 833 (10th Cir. 1986) (citing Wolcott v. United States, 407 F.2d 1149, 1150 (10th Cir. 1969)). As for Ellick's claim of ineffective assistance of counsel, we decline to review it on direct appeal. See United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995).

For the foregoing reasons, we AFFIRM.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge