Michael ANTHONY, Petitioner–
Appellant,

v.

Steven CAMBRA, Jr., Warden,
Respondent–Appellee.

No. 99–15458.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 2000.

Filed Dec. 15, 2000.

David W. Fermino, Office of the Federal Public Defender, San Francisco, California, for the appellant.

Sharon G. Birenbaum, Deputy Attorney General, San Francisco, California, for the appellee.

Before: CANBY, REINHARDT and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

REINHARDT, Circuit Judge:

Michael Anthony appeals the district court's denial of his motion to amend his habeas corpus petition filed under 28 U.S.C. § 2254. He also appeals the district court's denial, on the merits, of his unamended petition. We affirm in part, reverse in part, and remand for further proceedings.

## I. Factual and Procedural Background

Ronald Ewing's body was found washed up on a beach in San Mateo County, California, on May 8, 1984. He had been shot four times.

On May 10, 1984, petitioner Michael Anthony and his attorney met with two San Mateo County sheriff's deputies, a San Mateo deputy district attorney, and an assistant United States attorney. Anthony entered into an immunity agreement recorded in a four-page document and in a taped oral statement setting forth additional provisions. The content of this immunity agreement is reproduced, in pertinent part, in Section II.C.2, *infra.*

Anthony denied any participation in Ewing's murder and told the authorities that although he had been with Ewing on the evening of May 7, he had left Ewing in the company of a cocaine dealer (who Anthony believed had killed Ewing) and an unknown woman. The "cocaine dealer" was later identified as Drax Quartermain and the woman as Debra Chandler.

After several years of investigation, the state concluded that Anthony had conspired with his business partner, Ronald McIntosh, and that they had contracted with Quartermain, a hit man, to have Ewing murdered. By information filed in San Mateo County Superior Court, the state charged Anthony with (1) the first degree murder of Ewing, in violation of Cal.Penal Code § 187, the information alleging that the murder was carried out for financial gain under Cal.Penal Code § 190.2(a)(1); and (2) conspiracy to commit murder, in violation of Cal.Penal Code § 182, the information alleging seven overt acts in furtherance of the conspiracy. The information also charged that Anthony had served a prior felony prison term under Cal.Penal Code § 667.5(b). At a preliminary hearing, a magistrate judge rejected Anthony's motion to dismiss the case on the basis of the state's alleged violation of the immunity agreement. The superior court agreed with the magistrate that no violation had occurred.

Anthony was tried in the spring of 1990. The prosecution's chief witnesses were Debra Chandler (Drax Quarterman's companion on the night of the murder), and David Younge. Chandler testified that she had been present when the murder was committed, and that Quartermain had offered her $5000 to be his driver that night. Chandler described hearing the shots fired, and testified that Quartermain acknowledged that he had violated his "contract" by failing to remove the victim's head and hands to make identification impossible. A Corvette—identified as belonging to Anthony—had been present as well at the murder scene.

Younge testified that he had driven Quartermain to various meetings with Anthony and McIntosh during which the murder-for-hire was planned. On one occasion, Anthony and McIntosh brought Ewing to a restaurant so that Quartermain, once again accompanied by Younge, could "eyeball" the intended victim. Younge testified that in the summer of 1984 (after the murder had been committed), Quartermain complained to him repeatedly that Anthony had not paid him in full for the murder and, at Younge's suggestion, Quartermain thereafter retained an attorney who sued Anthony for breach of contract, seeking compensation for "services rendered."

Other witnesses testified that they had seen Anthony and Ewing together on the night of the murder, including a waitress who recalled waiting on Anthony, Ewing, and Quartermain shortly before the murder was committed. Talbot Gregory, an associate of Quartermain's, testified that approximately a year after Ewing's murder, Quartermain had related that he had shot a black man on the beach, and that the money had been "terrific." Further testimony and documentary evidence confirmed that Anthony and Ewing had had a strained business relationship.

On May 3, 1990, the jury found Anthony guilty of both charges. It also found the financial gain special circumstance true, and the trial court found the prior prison term allegation true. On July 1, 1990, the trial court sentenced Anthony to life without the possibility of parole, with a consecutive one-year enhancement for his prior prison term. On June 30, 1992, the California Court of Appeal affirmed the judgment, and on September 24, 1992, the California Supreme Court denied Anthony's petition for review.

On April 21, 1997, Anthony delivered to prison authorities a petition seeking habeas relief from the California Supreme Court. That petition was marked filed by the state court on April 25. Meanwhile, on April 23, 1997—one year after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA)—Anthony filed a pro se petition for a writ of habeas corpus in federal court. The petition contained six claims, only one of which had been exhausted in state court. *See Anthony v. Cambra,* 21 F.Supp.2d 1094, 1095 (N.D.Cal.1998). The district court dismissed the petition without prejudice. On June 13, 1997, Anthony filed another petition containing only his one exhausted claim, together with a motion to stay the petition pending exhaustion of his unexhausted claims. As the district court later explained, "The court construed the petition as an amendment deleting the unexhausted claims and granted [Anthony's] motion to stay the petition to allow him an opportunity to exhaust his other five claims. Upon exhaustion of those claims, [Anthony] could move to further amend the petition to add the newly-exhausted claims." *Id.* On February 18, 1998, the district court denied the state's motion for reconsideration, which argued that Anthony's petition should be dismissed as untimely. *See Anthony v. Cambra,* 1998 WL 164971 (N.D.Cal. Feb.18, 1998). Anthony exhausted his five claims in state court and then moved to file an amended petition in federal court that would add his newly-exhausted claims.

On August 5, 1998, the district court denied Anthony's motion to amend. Finding "persuasive" this court's dicta about the "abuse of the writ" doctrine in *Calderon v. United States Dist. Ct. (Taylor),* 134 F.3d 981, 986–88 (9th Cir.1998), and relying on *Farmer v. McDaniel,* 98 F.3d 1548 (9th Cir.1996), the district court found that Anthony had "waited until the last minute to attempt to exhaust his claims before his period of limitations expired on April 23, 1997," and had failed to show cause why he did not exhaust and raise those claims earlier. *Anthony,* 21 F.Supp.2d at 1095–96. Anthony had also failed to show that a fundamental miscarriage of justice would result from the district court's refusal to entertain the claims. *Id.* at 1096. The

district court concluded that Anthony's newly-exhausted claims were "barred by principles of abuse of the writ." *Id.*

On January 20, 1999, the district court denied relief on Anthony's one exhausted claim—that is, his contention that the state violated his immunity agreement. On February 16, 1999, Anthony filed a timely notice of appeal. The district court issued a certificate of appealability as to Anthony's immunity-agreement claim. A panel of this court subsequently granted Anthony's request for an expanded certification of appealability, allowing him to challenge the district court's "abuse of the writ" ruling as well.

## II. · *Analysis*

### A. *Abuse of the writ*

■ After the district court's ruling that Anthony's amended petition constituted an abuse of the writ, but before oral argument in this case was held, the Supreme Court issued its decision in *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). The state subsequently filed a letter in this court, citing *Slack* and withdrawing its argument "that amendment of an exhausted petition constitutes a second or successive writ."

The state's concession was properly made. It is clear that the district court's application of the "abuse of the writ" doctrine cannot survive *Slack*. Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts incorporates the Supreme Court's decisions regarding successive petitions and the "abuse of the writ" doctrine. *McCleskey v. Zant*, 499 U.S. 467, 487, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (*cited in Slack*, 120 S.Ct. at 1605). Rule 9(b) states:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert

those grounds in a prior petition constituted an abuse of the writ.

The district court in this case cited *Farmer v. McDaniel*, 98 F.3d 1548, 1560 (9th Cir.1996), for the proposition that "[t]here is no requirement" under Rule 9(b) "that the prior petition have been determined on the merits" for the petition alleging new grounds to be dismissed. *Anthony*, 21 F.Supp.2d at 1095. In *Slack*, however, the Supreme Court rejected that proposition and characterized our decision in *Farmer* as "incorrect." 120 S.Ct. at 1606. Quoting and reaffirming its opinion in *Stewart v. Martinez–Villareal*, the Court explained:

"[None] of our cases ... have [sic] ever suggested that a prisoner whose habeas petition was dismissed for failure to exhaust state remedies, and who then did exhaust those remedies and returned to federal court, was by such action filing a successive petition." *Stewart v. Martinez–Villareal*, 523 U.S. 637, 644, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). We adhere to this analysis. A petition filed after a mixed petition has been dismissed under *Rose v. Lundy* [455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) ] before the district court adjudicated any claims is to be treated as "any other first petition" and is not a second or successive petition.

*Slack*, 120 S.Ct. at 1605.

Thus, it was error for the district court to treat Anthony's amended petition as a second or successive petition. Dismissal of these claims as an "abuse of the writ" was not warranted.

### B. *Timeliness*

As an alternative ground for affirming the district court's denial of Anthony's motion to amend his petition and its denial of his one previously exhausted claim, the state argues that the district court erred in holding that Anthony's federal petition was timely filed. The state contends that Anthony's exhausted claim is time-barred because his petition was filed on June 13,

1997, more than a month after the AEDPA period of limitation expired on April 23, 1997. In this connection, the state argues that Anthony's state habeas petition, which contained Anthony's five unexhausted claims, did not toll the federal limitations period because it was not filed in the California Supreme Court until April 25, 1997, two days after the limitations period had expired.

The district court relied on two alternative theories in denying the state's timeliness objections. First, it reasoned that principles of equity required it to construe Anthony's June 13, 1997 petition "as an amendment or resubmission to the original petition filed on April 23, 1997." *Anthony*, 1998 WL 164971, at *2. That is to say, the district court considered the June 13 filing not as an untimely petition but as an amendment to a timely filed petition. Second, the court applied the prison "mailbox rule" and determined that Anthony's state habeas petition had been filed, for statute of limitations purposes, on April 21, 1997—two days *before* the expiration of the limitations period. *See id.* at *2–*3. Accordingly, the district court held, AEDPA's statue of limitations was tolled during the period in which Anthony was pursuing state collateral relief, and the June 13 petition was timely. We address each of the district court's rulings in turn.

### 1. *The June 13 petition*

It is undisputed that the district court dismissed Anthony's April 23, 1997 petition without affording him an opportunity to amend or to resubmit the petition with only exhausted claims. The question is whether the district court acted within its authority when it treated Anthony's June 13 petition as an amendment that related back to and preserved his original filing date of April 23. We hold that it did.

In *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the Supreme Court held that "mixed" federal habeas petitions—that is, those containing both exhausted and unexhausted claims—

must be dismissed for failure to exhaust state remedies. The Court directed district courts to provide habeas petitioners "with the choice of returning to state court to exhaust [their] claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." *Id.* at 510, 102 S.Ct. 1198. In applying *Rose*, this court has "long held that a federal habeas petitioner has a right to amend a mixed petition to delete unexhausted claims as an alternative to suffering a dismissal." *James v. Giles*, 221 F.3d 1074, 1077 (9th Cir.2000); *see also Taylor*, 134 F.3d at 986.

Prior to the advent of AEDPA, dismissal without prejudice to the filing of a new, exhausted petition caused no detriment to the petitioner, because there was no time limitation on the filing of a federal habeas petition. AEDPA's one-year statute of limitations, however, has rendered outright dismissal perilous to some litigants, because petitioners such as Anthony may find themselves time-barred when they attempt to resubmit their exhausted claims to the district court. The district court in the instant case recognized that its dismissal of Anthony's mixed petition without prejudice to the filing of a new petition was improper in light of AEDPA:

> The new statute of limitation on the filing of federal habeas corpus petitions requires that district courts provide prisoners who file mixed petitions with an opportunity to strike their unexhausted claims and amend or resubmit their petitions so that their amendment or resubmission can relate back to the date of the original filing and not be time-barred.

*Anthony*, 1998 WL 164971, at *2. Because the court's dismissal "did not afford petitioner such an opportunity," construing the June 13 filing as an amendment—as opposed to a new (and time-barred) petition—was, in the court's view, the appropriate remedy. *Id.*

■ As an initial matter, we agree with the district court that its outright dismissal of Anthony's April 23 petition was improper. This court has made clear that district courts must provide habeas litigants with the opportunity to amend their mixed petitions by striking unexhausted claims as an alternative to suffering dismissal. In *Taylor*, we explained that Federal Rule of Civil Procedure 15(a), which allows litigants to amend their pleadings once "as a matter of course" before a responsive pleading has been filed, applies to habeas corpus actions and requires district courts to allow amendment of mixed federal habeas petitions. 134 F.3d at 986; *see also James*, 221 F.3d at 1077–78 (pro se habeas litigants are entitled to a "statement of the grounds for dismissal and an opportunity to amend the complaint to overcome the deficiency unless it clearly appears from the complaint that the deficiency cannot be overcome.... [E]ven in the habeas context, we remain guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on pleadings or technicalities.") (citations omitted); *Freeman v. Page*, 208 F.3d 572, 577 (7th Cir. 2000) (dismissal of mixed federal petition "is not proper when that step could jeopardize the timeliness of a collateral attack"). Thus it was error for the district court to dismiss Anthony's April 23 petition without providing him the opportunity to amend.

■ Notwithstanding the district court's error, the state contends that Anthony's June 13 filing cannot be construed as an amendment to his April 23 petition, because that petition had been dismissed, and there was no pending petition that could be amended. However, we agree with the district court that it properly exercised its equitable powers to accept Anthony's June 13 petition *nunc pro tunc* to April 23, the date of the original filing. *See Calderon v. United States Dist. Ct. (Kelly)*, 163 F.3d 530, 540 (9th Cir.1998) (en banc) (noting that district court could exercise *nunc pro tunc* power to deem recently filed habeas petitions to have been filed as of the filing date of two earlier petitions that were erroneously dismissed); *cf. Guizar v. Estelle*, 843 F.2d 371, 371 (9th Cir.1988) (district court may accept resubmitted petition with only exhausted claims *nunc pro tunc* to date of original filing). Accordingly, Anthony's June 13 petition, which contained only his exhausted claim, was timely filed.[1]

## 2. The Mailbox Rule

Even if the district court had declined to construe Anthony's June 13 filing as an amendment to his April 23 petition, the June 13 filing of his previously exhausted claim must be considered timely if AEDPA's statute of limitations was tolled by Anthony's state habeas petition. Under 28 U.S.C. § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." The district court found that Anthony had delivered his petition to prison authorities on April 21, 1997—two days before the AEDPA deadline. Applying the "mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), the court deemed Anthony's peti-

1. *Green v. White*, 223 F.3d 1001, 1002 (9th Cir.2000); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), and *Henry v. Lungren*, 164 F.3d 1240, 1241 (9th Cir.1999) are not to the contrary. In those cases, the petitioners accepted the dismissals of their mixed petitions and, after exhausting state remedies, filed their renewed petitions and attempted to have them relate back to their earlier, properly dismissed petitions. In those circumstances, we denied the relations back because nothing remained of the earlier proceedings. Here, in contrast, Anthony did not accept the dismissal of his mixed petition; he elected instead to resubmit his petition with only his exhausted claim. *Rose* and our own case law plainly provided him that option. The district court erred in dismissing the petition without leave to amend; it acted within its discretion when it corrected its error by construing Anthony's June 13 filing as an amendment.

tion "properly filed" on that date, thus tolling the limitation period until June 13, 1997, when Anthony filed his new federal habeas petition. *See Anthony,* 1998 WL 164971, at \*2–\*3.

■ The state argues that because the California Supreme Court treated Anthony's state habeas petition as filed on April 25, 1996, he missed the AEDPA deadline by two days. Citing the Fifth Circuit's decision in *Coleman v. Johnson,* 184 F.3d 398 (5th Cir.1999), *cert. denied,* 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000), the state contends that federal courts have no authority to apply the mailbox rule to state filings. However, in *Saffold v. Newland,* 224 F.3d 1087 (9th Cir. 2000), we squarely held that the mailbox rule applies with equal force to the filing of state as well as federal petitions, because "[a]t both times, the conditions that led to the adoption of the mailbox rule are present; the prisoner is powerless and unable to control the time of delivery of documents to the court." *Id.* at 1091. *Saffold* is directly controlling here. Because Anthony's state petition was timely filed, AEDPA's statute of imitations was tolled during pendency of state proceedings, and the June 13 petition was therefore timely.

3. *Anthony's Newly Exhausted Claims*

■ Having determined that Anthony's June 13 submission of his previously exhausted claim was timely either as an amendment to his April 23 petition or pursuant to the prison mailbox rule, we must now decide whether Anthony's motion to amend his petition to include his newly exhausted claims—which the district court erroneously dismissed as an abuse of the writ—was timely filed. Anthony attached to his June 13 filing a motion to hold his federal petition in abeyance while he exhausted his five remaining claims in state court. Our precedent unequivocally authorizes district courts to stay fully exhausted federal petitions pending exhaustion of

other claims. *See Taylor,* 134 F.3d at 986–88; *see also Fetterly v. Paskett,* 997 F.2d 1295, 1301 (9th Cir.1993).

What makes this case unusual is that Anthony's June 13 motion to stay federal proceedings appears to have slipped through the judicial cracks. The district court was unaware of the motion until September 23, when Anthony renewed his request, evidently because the original motion had not been file stamped. *See Anthony,* 1998 WL 164971, at \*1. Adding further confusion is that neither Anthony nor the state was aware that the California Supreme Court had already denied Anthony's state habeas petition on July 30, prior to the renewal of Anthony's abeyance motion.

On October 29, the district court granted Anthony's motion to stay federal proceedings. It did so even though it noted that Anthony's state petition had already been denied on July 30. The court observed that Anthony had timely filed his original federal petition on April 23, seeking to raise all of his claims, and that he had then agreed to proceed with his exhausted claim only and had promptly requested a stay. Having "proceeded expeditiously and in good faith," Anthony was entitled to the opportunity to present his claims in federal court. *Order Granting Petitioner's Motion to Stay Federal Habeas Petition* at 4, October 29, 1997. Because all of Anthony's claims were now exhausted, the court ordered Anthony to file his amended petition within 30 days of the date of its order. *Id.* at 4–5.

The state moved for reconsideration of the court's October 29 order, and the court reaffirmed its prior ruling by order of February 18, 1998. The court once again directed Anthony to file a motion to amend his petition, together with the amended petition, within 30 days. As explained above, when Anthony did file his motion to amend and his amended petition,[2] the dis-

2. The amended petition was delivered to prison authorities on March 17, 1998 (within 30 days of the court's order) and filed in the district court on March 23, 1998.

trict court denied the motion under abuse-of-the-writ principles.

It is beyond dispute that had the district court promptly ruled on Anthony's abeyance motion, and had Anthony returned to the district court with his newly exhausted claims within AEDPA's time limitation, he would have been entitled to proceed with all of his claims in federal court. Here, however, the state's highest court had already denied Anthony's petition at the time the abeyance motion was granted. Therefore, as of July 30, 1997, AEDPA's statute of limitations was no longer being tolled by state-court proceedings, and Anthony's amended petition—filed in March of 1998—was untimely, unless it "related back" to the original petition. Anthony contends that under Federal Rule of Civil Procedure 15(c), his amended petition related back to his timely filed petition, thereby avoiding AEDPA's strict period of limitation. The state insists that Rule 15(c) cannot apply to habeas corpus cases in light of AEDPA, because allowing relation back of otherwise time-barred •claims would offend Congress's intent to expedite the presentation of claims in federal court.

■ We reject the state's argument. 28 U.S.C. § 2242 states that applications for habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." Similarly, Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts states that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to the petitions filed under these rules." The state has cited to no authority that supports the proposition that AEDPA renders Rule 15 inapplicable to federal habeas corpus proceedings, and there is substantial authority to the contrary. *See, e.g., Calderon v. Ashmus,* 523 U.S. 740, 750, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (Breyer, J., concurring) (under Habeas Rule 11, and unless otherwise expressly

governed by statute, habeas corpus amendments are governed by Rule 15); *United States v. Thomas,* 221 F.3d 430, 436 (3d Cir.2000) (holding that Rule 15(c) applies to post-AEDPA § 2255 petitions); *Mederos v. United States,* 218 F.3d 1252, 1254 (11th Cir.2000) (applying Rule 15(c) to post-AEDPA habeas petition and holding that amended pleading related back to original timely pleading); *Grossi v. United States,* 1999 WL 439237, at *10–*11 (N.D.Ill. June 28, 1999) (applying Rule 15(c) to post-AEDPA petition to allow amendment of timely § 2255 petition to include otherwise untimely claims). Indeed, we see no inconsistency between AEDPA's statute of limitations and Rule 15(c)'s amendment regime where, as here, the state is on notice of the claims to be raised; as a leading treatise explains, "[t]he rationale of allowing an amendment to relate back is that once a party is notified of litigation involving a specific factual occurrence, the party has received all the notice and protection that the statute of limitation requires." [3]

Under Rule 15(c)(2), an amendment of a pleading relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." We need not determine here the full scope of the rule's application to amendments of habeas petitions, because in this case, it is plain that the central policy of Rule 15(c)—ensuring that the non-moving party has sufficient notice of the facts and claims giving rise to the proposed amendment—has been satisfied. Each of the newly-exhausted claims in Anthony's amended petition was included (in unexhausted form) in his original April 23 petition, to which the district court construed his June 13 filing as an amendment. Consistent with the rule, those claims had been "set forth or attempted to be set forth in the original

3. James Wm. Moore et al., *Moore's Federal Practice* § 15.19[1] (3d ed.1999).

pleading." The state clearly had prior notice of the claims and of Anthony's intention to raise them at the earliest possible time.[4] Thus, this case is easily distinguishable from the cases cited by the state in which other circuits have declined to apply Rule 15(c) to attempted amendments; in those cases, the courts specifically relied on the *absence* of notice to the state regarding the content of the proposed amendments as grounds for denying the motions. For example, in *United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999), the petitioner timely filed a petition under section 2255, then, following expiration of AEDPA's statute of limitations, sought to amend his petition by adding an entirely new claim for relief. The court explained that the touchstone of Rule 15(c) is notice; in this case, the court "[could] not say that [the petitioner's] original petition would provide notice of such a different sort of theory," so Rule 15(c) could not be invoked. *Id.* at 457. Similarly, in *United States v. Duffus*, 174 F.3d 333 (3d Cir.1999), the petitioner's proposed amendment, filed after AEDPA's deadline, raised a "completely new" allegation of ineffectiveness of counsel and therefore could not relate back to the earlier petition. *Id.* at 337 (citing *Craycraft* ).[5] In stark contrast, Anthony presented all of his claims to the district court within AEDPA's limitation period and legitimately requested that his exhausted claim be held in abeyance; he has not employed Rule 15(c) merely as a method of extending AEDPA's deadline.

▮ We note that, contrary to the state's admonitions, allowing habeas petitioners to invoke 15(c) in these circumstances will not undermine AEDPA's policy of expediting habeas review. Under Rule 15(a), once a responsive pleading has been served, the habeas petitioner must gain leave of the court before being permitted to amend. Although, under the rule, "leave shall be freely given when justice so requires," the district court may consider whether there is any evidence of "undue delay, bad faith or dilatory motive" with respect to the filing of the amendment when determining whether leave should be granted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). So, had Anthony, without explanation, waited several years, or even several months, before filing his proposed amendment, it might well have been within the district court's discretion to deny leave to amend under Rule 15(a). Here, however, there is no evidence of undue delay; on the contrary, any delay regarding the amendment was largely caused by the district court's request for briefing on Anthony's motion to stay proceedings and by the state's motion to reconsider the court's ruling. The only period of "delay" even arguably attributable to Anthony is the time between July 30—when, unbeknownst to Anthony or the state, the California Supreme Court denied his state petition—and September 23, when Anthony renewed his motion to stay federal proceedings. During that time, Anthony had not been notified that his state petition was no longer pending before the state courts, and he could not have known why the district court had neglected to rule on his June 13 motion to stay proceedings. We agree with the district court's conclusion that Anthony proceeded with reasonable diligence. We add only that after September 23, 1997, Anthony's filings complied with

4. We need not consider here a different theory on which Anthony's amended petition may also relate back. The June 13 petition was timely and was accompanied by a motion to stay, which likely set forth or incorporated by reference the unexhausted claims. Therefore, the amended petition might be deemed to relate back to the June 13 petition, even in the absence of the *nunc pro tunc* treatment afforded the June petition by the district court. We see no reason to complicate this procedural labyrinth further, however, and thus do not consider the alternate theory.

5. *See also Davenport v. United States,* 217 F.3d 1341, 1344 (11th Cir.2000) (untimely amendment including only entirely new claims could not relate back to original timely petition); *United States v. Pittman,* 209 F.3d 314, 317–18 (4th Cir.2000) (same).

the schedule imposed by the district court, so he cannot properly be held responsible for the timing of the proposed amendment. Rule 15(c) is ideally suited to circumstances such as these, and we hold that Anthony's amended petition, which included the five previously unexhausted claims contained in his original timely petition, related back to that petition. Accordingly, we reverse and remand to the district court for further proceedings with respect to those claims.

We now turn to the merits of Anthony's unamended petition, which raised a single claim for relief.

## C. *The Immunity Agreement*

### 1. *Standard of Review*

■ Under AEDPA, this court may reverse a state court's decision denying a petitioner relief only if that decision is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" federal law if it either (1) fails to apply the correct controlling authority, or (2) applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000). A state court's decision can involve an "unreasonable application" of federal law if it either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Id.* at 1520.[6]

■ In determining what constitutes an "unreasonable application" of federal

law, this court is guided by the doctrine of "clear error," which "generally allows for reversal only where the court of appeals is left with a 'definite and firm conviction' that an error has been committed." *Van Tran*, 212 F.3d at 1153. In making this determination, this court first considers whether the state court erred at all; only after concluding that an error occurred does this court decide whether that error involved an unreasonable application of controlling law within the meaning of section 2254(d). *Id.* at 1155.

### 2. *The Agreement*

Anthony contends that the state's violation of his immunity agreement requires this court to reverse his conviction and sentence. Anthony's written immunity agreement states, in pertinent part:

It is agreed that at the present time, MICHAEL ANTHONY is not a suspect of this crime and that he was contacted by the police officers as part of their investigation of the killing of Ron Ewing. That shortly after they attempted to contact Mr. ANTHONY, arrangements were made for him to voluntarily come to the police station for the purposes of providing the information that he knew. That based upon the above-recited facts, JUDD C. IVERSEN, attorney for MICHAEL ANTHONY, advised him that he should not speak to the police officers prior to obtaining an agreement for immunity and the cooperation and assistance of the law enforcement authorities in attempting to prevent any revocation of the probations which MICHAEL ANTHONY is presently serving.

Based on the desire of MICHAEL ANTHONY to cooperate with the investigating homicide detectives and their need to obtain the information from him

---

**6.** In holding that the "California Court of Appeal's carefully-reasoned decision is *not so clearly incorrect that it would not be debatable among reasonable jurists,*" (emphasis added), the district court applied the Fifth Circuit's formulation of the standard of review under § 2254(d)(1), *see Drinkard v. Johnson*, 97 F.3d 751, 768–69 (5th Cir.1996). The Supreme Court rejected this formulation in *Williams*, 120 S.Ct. at 1521–22.

to locate and to bring to justice the perpetrator of the crime, it is agreed that there will be no state or federal prosecution of MICHAEL ANTHONY with regard to the killing of Ron Ewing provided MICHAEL ANTHONY is telling the truth when he represents that he is not the person who actually did the shooting of Ron Ewing and that he did not enter into an agreement prior to the killing with the perpetrator of the killing that that person was to kill Ron Ewing. Although it is not apparent that MICHAEL ANTHONY faces any criminal liability based upon the actual killing of Ron Ewing, it is agreed that provided he has been and continues to be truthful with regard to his knowledge of that killing, he will be given immunity from any state and/or federal prosecution based upon that homicide.

In addition to the written instrument, the parties recorded a statement "memorializing" the agreement between Anthony and the district attorney's office. On that recording, a prosecutor first summarized the terms of the written agreement:

> The agreement [purports] to be a grant of immunity with respect to the information which the witness is about to provide to law enforcement[.] [W]ithout going into specifics, it in effect grants this witness use and transactional immunity with respect to narcotic transactions which have occurred and about which he's about to provide information. It, it had, it's a grant of limited immunity with respect to the homicide. The understanding generally being by the parties that if the witness cooperates and provides truthful information and was not a principal in the homicide, he then will not suffer any prosecution. It's anticipated that he will provide at all times truthful information, that he'll cooperate

with us and, and in exchange for that, there will be no prosecution, assuming, in fact, there could be one based upon his involvement and or presence with the victim in this case.

Anthony then asked the prosecutor to clarify that accusations from the two people whom he had implicated in the murder (later identified as Drax Quartermain and Debra Chandler) would not be sufficient to establish that he had violated the immunity agreement:

> Anthony: Uh, at that meeting also that you said that I want it on tape. That you, that you have said and I feel that when we bring this guy to trial that possibly he's gonna try to point his finger at me and, as a last result. Is that how you say that?

> Prosecutor: Okay. It's anticipated that, that based upon the recitals and what limited conversations we've had with the witness and his attorney, Mr. Iverson, that the potential suspect, referred to as the perpetrator in the agreement, may well indicate that the witness, in fact, was the person who actively participated in the crime. It's also my understanding from our limited conversations that present at the scene at the time of the departure of the witness was a third person. Possibly a female subject. It's the understanding of the office of the District Attorney that the accusations, if any, to be made by those two people, toward yourself, would not constitute a basis for violating this agreement.

Finally, Anthony asked for assurance on the subject of his probation:

> Anthony: Everybody's gonna do everything in their power not to get me violated for helping. Is that correct?

> Iverson: That's true.

Prosecutor: As long as, as long as you cooperate fully with, with the police officers.

Anthony: Okay.

Prosecutor: And provide truthful information.

Anthony: Okay.

Prosecutor: And that you understand that at some future date and time we develop independent evidence that you, in fact, were an active participant in the crime, a principal, why then all the information which you're providing us today can be used to prosecute you? Do you know?

Anthony: I understand that.

Prosecutor: And that would relate to not only your probation violations, but also to narcotic offenses as well as the homicide?

Anthony: I understand.

Iverson: But that's correct and with, and we've also discussed the fact that evidence is more than simply this gentleman and his girlfriend or whoever she was, coming forward and trying to, to involve you —

Prosecutor: Right.

Iverson: We require some sort of corroborating evidence.

Anthony: Okay. I understand that. I understand that sir.

D. *Analysis*

■ Anthony contends that his right to due process was violated because the state failed to honor his immunity agreement. He does not argue that the state failed to obtain the "corroborating evidence" (e.g., the testimony of Younge) specified in the informal agreement, but rather that under the agreement, the use of that evidence against him was prohibited because it was derivative. Anthony is incorrect.

As the district court recognized, Anthony's immunity agreement was informal in nature. "When, as in this case, the defendant has not been forced to testify and so had not claimed the Fifth Amendment privilege against self-incrimination, the government can grant the defendant varying degrees of immunity in an informal agreement." *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir.1995) (citations omitted).

Anthony contends that the immunity agreement granted him derivative use immunity, which would have required the state "to have derived all the information on which the subsequent prosecution was based from a source wholly independent of the statements made in the interview." *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir.1991). In other words, according to Anthony, the agreement prohibited the state from prosecuting him on the basis of any evidence derived from the information Anthony provided on May 10, 1984, about the person he identified as "Drex" and "the female subject." In making this argument, Anthony points to the prosecutor's statement that the state could use "all the information which you're providing today" only if "at some future date and time we develop independent evidence that you, in fact, were an active participant in the crime, a principal."

The question, of course, is: evidence "independent" of what? Anthony insists that the "independent evidence" remark was ambiguous and, therefore, should be construed in his favor. *See Plummer*, 941 F.2d at 804. On this point, however, we agree with the analysis of the California Court of Appeal:

On appeal, Anthony once again contends the immunity agreement was breached and that his prosecution should have been dismissed. He renews his interpretation of "independent evidence," and argues that any evidence obtained through his statement could not be used against him to prove his

guilt at trial. Anthony's interpretation of the phrase "independent evidence" is strained. When the phrase is read in context, it is clear the immunity agreement contemplated by the prosecution could pursue any information provided by Anthony. The agreement contemplated only that Anthony's immunity would not be abrogated simply on the uncorroborated accusations of the two persons present at the scene of the murder. If the prosecution developed evidence of Anthony's involvement in the murder "independent" of the uncorroborated accusations of these two persons, then Anthony could be prosecuted based on all the evidence the prosecution could muster—including the information provided in the statement. In other words, the "independent evidence" referred to in the agreement is evidence independent of the accusations of the perpetrator and his companion, not evidence independent from witnesses and leads developed from Anthony's statement.

Put slightly differently, Anthony's agreement involved two conditions: (1) he would not be prosecuted "provided" he was "telling the truth" that he neither killed Ewing nor arranged for his murder; and (2) the uncorroborated accusations of Quartermain and Chandler would constitute an insufficient basis for the state to conclude that Anthony was not "telling the truth." The latter condition was introduced into the statement at the insistence of Anthony himself, who was evidently concerned about the prospect that Quartermain, once arrested, would point the finger at him. Where this left Anthony was that if Quartermain and Chandler sought to implicate him, he could only be prosecuted if the state obtained corroboration of their accusations.

In retrospect, of course, the agreement turned out to be rather a bad deal for Anthony. An agreement providing immunity on the condition that the subject is telling the truth about his lack of involvement in the crime does not accomplish much. This court has observed that immunity agreements are "to be read as a whole and given a reasonable interpretation, not an interpretation that would produce absurd results." *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir.1985) (citations omitted). Accordingly, we would hesitate to affirm a construction of the agreement under which Anthony could have received absolutely no benefit. The agreement did, however, provide Anthony with immunity from prosecution based merely on the testimony of Quartermain and Chandler, and it also provided him a promise of assistance from state and federal authorities to prevent the revocation of his probation, as well as immunity from state and federal drug prosecution for the drug offenses he admitted committing on the evening of May 7, 1984. We therefore conclude that the state court's interpretation of the immunity agreement did not produce an absurd result.

Because we hold that the California Court of Appeal did not err in denying Anthony's due process claim, its decision necessarily is not contrary to, nor does it involve an unreasonable application of, controlling law under § 2254(d)(1).

### III. *Conclusion*

We affirm the district court's denial of Anthony's due process claim based on the alleged violation of his immunity agreement. We reverse the denial of Anthony's motion to amend his section 2254 petition to include his five previously unexhausted claims, and we remand for further proceedings on those claims.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in parts II–A, II–B–2, and II–C of the majority opinion. However, I am unable to concur in parts II–B–1 or in II–B–3.

582

In particular, the simple fact is that, for good or ill, the first federal habeas corpus petition was dismissed. Even if it should not have been, Anthony should have appealed. His new filing could not relate back to the dismissed filing. *See Green v. White,* 223 F.3d 1001, 1003 (9th Cir.2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1148 (9th Cir.2000); *Henry v. Lungren,* 164 F.3d 1240, 1241 (9th Cir.1999). The majority's carving out of a district-court-should-not-have-dismissed in-the-first-place rule will breed nothing but confusion. Again, if Anthony was not satisfied with the ruling, he should have appealed it; he did not. The majority's distinguishing of our prior cases is not persuasive. *See* Maj. Op. p. 574 n. 1. The point of those cases did not turn on whether the petitioner had exhausted the unexhausted claims; it was that there was nothing to relate back to once there was a dismissal. Of course, I recognize that any case can be distinguished, but attempted distinctions of the kind made in the footnote seem to undercut any suggestion that we will follow precedent.

As a result, because the holding in part II–B–3 of the proposed opinion hinges on the notion that the June 13th petition was merely an amendment to the April 23rd petition, which included all claims, I do not agree with that portion of the opinion either. I do not disagree with the general principle that relation back theories are available in proper habeas corpus cases. However, again, I disagree with the minor premise. In fact, the result here points to one of the dangers lurking in the minor premise in the first place. The mere mention of unexhausted claims becomes sufficient to stop the statute of limitations on all claims, even if the petition, itself, has been dismissed. In other words, whatever might be said for the relation back doctrine, it cannot help Anthony in this case. That being so, I would not reach the issue at all, and I do not join in that portion of the majority opinion.

Finally, although I do concur in part II–C, I am constrained to say that I cannot join in the notion that "providing immunity on the condition that the subject is telling the truth about his lack of involvement in the crime does not accomplish much." *See* Maj. Op. p. 581. I do not quite see why, in general, the only useful form of immunity is one that permits lying. I find that to be a rather strange concept. Here Anthony's alleged concern was that the others would lie about him, and he did not want to fight that particular battle. As it was, he was the one who was lying. It did not accomplish much for *him,* but to state that in principle you do not get much from telling the truth seems unduly cynical, and also seems to put some kind of premium on picaresque activity. Certainly, no defendant should rely on that particular dictum as a way of claiming that counsel failed him when he was allowed to agree to a truthfulness term.

Thus, for the reasons set forth above, I concur in part but respectfully dissent in part.