Michael ALVARADO, Petitioner–Appellant,

v.

R.Q. HICKMAN, Warden, Acting Warden of Mule Creek State Prison, Respondent–Appellee.

No. 00–56770.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 2002.

Filed Dec. 18, 2002.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 11, 2003.

Tara K. Allen, Malibu, CA, for the petitioner-appellant.

Deborah J. Chuang, Deputy Attorney General, Los Angeles, CA, for the respondent-appellee.

Before: SCHROEDER, Chief Judge, CUDAHY,* and McKEOWN, Circuit Judges.

CUDAHY, Circuit Judge.

Michael Alvarado was convicted of second degree murder and attempted robbery and is currently serving a 15–year to life sentence in California state prison. Alvarado's conviction was obtained primarily based on statements he made during a two-hour interrogation that occurred when he was 17 years old. Alvarado now seeks a writ of habeas corpus, alleging that he was deprived of his Fifth Amendment rights in violation of *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court denied Alvarado's request for relief. Our review of this case is governed by the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which permits us to grant a federal writ of habeas corpus only if the underlying state court decision is either contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

In *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court established the legal principle that juvenile defendants are, in general, more susceptible to police coercion than adults; as such, due process demands that a defendant's juvenile status be taken into consideration when determining the proper procedural safeguards that attach to a custodial interrogation. *Id.* at 599–601, 68 S.Ct. 302. During the last half century, the Court has consistently reaffirmed this principle. *See, e.g., Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993); *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *In re Gault,* 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). To date, the Supreme Court has not directly addressed the issue of how a defendant's juvenile status modifies an "in custody" determination for the purposes of *Miranda.* However, *Haley* and its progeny are highly instructive precedents to the case now before us. If a juvenile is more susceptible to police coercion during a custodial interrogation, then the same juvenile is also more susceptible to the impression that he is, in fact, in custody in the first instance.

In this case, the California Court of Appeal identified the correct legal standard for making an "in custody" determination. *See Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (stating that an "in custody" determination requires an inquiry into

---

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave").[1] But the California Court of Appeal (and the district court upon habeas review) failed to address how Alvarado's juvenile status, including the involvement of his parents at the behest of the police, affected the "in custody" determination. Relevant Supreme Court precedents lead us to conclude that Alvarado's youth and inexperience with the police are simply too important to be ignored. Moreover, on the facts of this case, proper consideration of this additional factor compels a different outcome, even under the highly deferential standard of review mandated by the AED-PA. We therefore REVERSE the judgment of the district court.

## I.

The underlying facts of this case are not in dispute. On the night of September 22, 1995, a murder occurred at a shopping mall in Santa Fe Springs, California. Approximately one month later, Sheriff's Detective Cheryl Comstock contacted the defendant's mother at her place of employment and informed her that police officials "needed" to speak to her son, Michael Alvarado. Alvarado's mother told Comstock that Michael's father would bring him to the Sheriff's station so he could be interviewed. Both Alvarado's mother and father accompanied their son to the Sheriff's station. However, they were refused permission to be present during the interview. When these events occurred, Alvarado was 17 years old, had no criminal history and had never been questioned by the police.

The interview, which was conducted exclusively by Comstock, lasted approximately two hours. During that time, Alvarado was not given a statement to sign indicating in any manner that he was participating voluntarily in the interview, nor was he advised of his *Miranda* rights. Alvarado initially offered an account of his activities on the night of the murder that did not include reference to the shooting or to the hiding of a gun (the most incriminating aspects of his subsequent statements). Comstock then expressed disbelief at Alvarado's version of events and informed him that she, in fact, had witnesses who said "quite the opposite." Shortly thereafter, Alvarado began to divulge details of the murder and of his role in hiding the murder weapon. Well into the course of the interview, and after Alvarado had started talking about the shooting and the hiding of the gun, Comstock made comments implying that Alvarado would be going home at the end of the interview. Alvarado's statements during the interview were admitted into evidence at trial. Alvarado later took the witness stand in his own defense.

Alvarado was convicted of second degree murder and attempted robbery in a jury trial. His conviction was subsequently affirmed by the California Court of Appeal on September 13, 1999. In both the trial court and on appeal, Alvarado raised his age as a relevant factor in the *Miranda* analysis. Unfortunately, the decision of the California Court of Appeal did not specifically discuss whether Alvarado's juvenile status altered the *Miranda* analysis. Instead, the court concluded that "a reasonable person under the circumstances in which Alvarado was questioned would have

---

1. The state court cited another state court opinion, but the standard for making the in custody determination is the same as the relevant federal standard. *See People v. Soto [ & Alvarado, et al.]*, No. 97DA2213, slip. op. at 12,18 (Cal.Ct.App., 2d Dist., Sept. 13, 1999) (*Soto* ) (citing *People v. Ochoa*, 19 Cal.4th 353, 401–02, 79 Cal.Rptr.2d 408, 966 P.2d 442 (1998)).

felt free to leave. The interrogation was not custodial and no *Miranda* warnings were required." *Soto,* No. 97DA2213, slip op. at 18. From the face of the opinion, it does not appear that Alvarado's age and inexperience with the police were included as part of the "in custody" analysis. In October 1999, Alvarado filed a Petition for Review in the California Supreme Court, which was denied on December 15, 1999.

On March 6, 2000, petitioner filed a petition for habeas corpus, pursuant to 28 U.S.C. § 2254, in the district court. On July 5, 2000, a magistrate judge issued a report recommending that the district court dismiss the petition with prejudice. Applying a totality of circumstances standard for determining whether Alvarado was in custody, the magistrate judge concluded that a reasonable person during the interrogation would have felt free to leave; therefore, Alvarado was not "in custody" during the interview.

On August 8, 2000, the district court adopted the magistrate's report and recommendation and denied Alvarado's petition. The district court also denied Alvarado's request for a certificate of appealability. On December 6, 2000, this court granted Alvarado's certificate of appealability with respect to one issue: "whether statements made by defendant were erroneously admitted by the trial court in violation of *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

## II.

A denial of a writ of habeas corpus presents a question of law that is reviewed de novo, though factual findings will be reviewed for clear error. *See Hartman v. Summers,* 120 F.3d 157, 160–61 (9th Cir.1997); *Perez v. Marshall,* 119 F.3d 1422, 1425–26 (9th Cir.1997). A determination whether an individual is "in custody" for the purposes of *Miranda*

warnings "is really a mixed question of law and fact, which is subject to de novo review by appellate courts"; however, the "state trial court's answers to the 'scene-and action-setting questions' (i.e., the underlying factual questions) still are entitled to a presumption of correctness." *Bains v. Cambra,* 204 F.3d 964, 972 (9th Cir. 2000) (citing *Thompson,* 516 U.S. at 111–12, 116 S.Ct. 457).

This case is, of course, a collateral appeal filed pursuant to 28 U.S.C. §§ 2253, 2254. Several years ago, the AEDPA modified these statutory sections and made more deferential the standard of review to be applied by a federal court in examining the claims of a prisoner under judgment of a state court. In this circuit, review of a habeas petition under the AEDPA requires a two-stage inquiry. The first question is "whether the state court erred at all." *Anthony v. Cambra,* 236 F.3d 568, 578 (9th Cir.2000) (citing *Van Tran v. Lindsey,* 212 F.3d 1143, 1155 (9th Cir.2000)). If the answer is yes, then we apply the AEDPA standard of review, which inquires whether the state court's "error" was contrary to, or involved an unreasonable application of, clearly established federal law, as defined in the precedents of the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Van Tran,* 212 F.3d at 1155 ("Requiring federal courts to first determine whether the state court's decision was erroneous, prior to considering whether it was contrary to or involved an unreasonable application of controlling law under AEDPA, promotes clarity in our own constitutional jurisprudence and also provides guidance for state courts, which can look to our decisions for their persuasive value."). We now address in order the two stages of this inquiry.

### A.

In the case now before us, Alvarado claims that his Fifth Amendment rights

were violated because he incriminated himself without ever being informed of his rights under *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The Supreme Court's holding in *Miranda*, of course, generally precludes the evidentiary use of statements resulting from a custodial interrogation unless the suspect has been first advised of his or her constitutional rights. *See Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Although *Miranda* warnings are required only when a suspect interviewed by the police is "in custody," *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526; *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, Alvarado asserts that he easily passes the Supreme Court's test for a custody determination, which is whether, under the totality of circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457; *see also Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that "the only relevant inquiry [to determine whether a suspect was 'in custody'] is how a reasonable man in the suspect's position would have understood his situation").

■ Ninth Circuit case law has further elaborated the "totality of circumstances" inquiry by identifying several factors that are relevant to the "in custody" determination:

> Pertinent areas of inquiry include [1] the language used by the officer to summon the individual, [2] the extent to which he or she is confronted with evidence of guilt, [3] the physical surroundings of the interrogation, [4] the duration of the detention and [5] the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief

questioning he or she would not be free to leave.

*United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981); *accord United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001); *United States v. Gregory*, 891 F.2d 732, 735 n. 3 (9th Cir.1989).

■ Under the specific facts of this case, Alvarado presents a compelling argument. Detective Comstock contacted Alvarado's mother at her place of employment and informed her that the police "needed" to speak with her son. Both parents then accompanied Alvarado, who was then only 17 years old, to the Sheriff's station so that he could be interviewed. Despite the fact that Alvarado had never been questioned by police before, his parents were refused permission to be present during the interview. Alvarado was then escorted· to an interrogation room, where Detective Comstock conducted a two-hour interview about the events of September 22, 1995. Despite the fact that Alvarado initially denied any knowledge or involvement in a crime, Comstock repeatedly pressured Alvarado to tell the "truth" as purportedly disclosed by the three notebooks of notes she had compiled from her interviews with alleged witnesses to the crime. Well into the course of the interview, after a substantial amount of incriminating material had been obtained, Alvarado was told that he could use the phone. Only at the end of the interview did Comstock inform Alvarado that he was free to go.

In response, the State argues that Supreme Court precedents have consistently held that when a suspect is not placed under arrest, voluntarily goes to the police station and is allowed to leave unhindered by the police after a brief interview, a finding of custody for *Miranda* purposes is unwarranted. *See, e.g., California v. Beheler*, 463 U.S. 1121, 1122–25, 103 S.Ct.

3517, 77 L.Ed.2d 1275 (1983) (no custody found when suspect voluntarily came to police station, was told he was not under arrest and was allowed to leave after thirty minute interview); *Oregon v. Mathiason*, 429 U.S. 492, 493–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (no custody found when officer left card at suspect's home stating that he would "like to discuss something" and to call, suspect voluntarily came to police station, was told he was a suspect, and was allowed to leave at conclusion of thirty minute interview). Moreover, the State points out that a determination of custodial interrogation does not necessarily follow from the fact that the interviewee is suspected of a crime, is questioned in the confines of a police station or is subjected to trickery or deceit during the course of the police interview. *See Mathiason*, 429 U.S. at 495–96, 97 S.Ct. 711 (police falsely stated that suspect's fingerprints had been found at the scene of the crime). In the instant case, the State argues that Comstock merely told Alvarado that she did not believe his version of the September 22 events.

Nevertheless, Alvarado makes a strong case that *Mathiason*, a principal case relied on by the district court to deny Alvarado's *Miranda* claim, is distinguishable on several grounds. First, the suspect in *Mathiason* came to the police station voluntarily and was told immediately that he was not under arrest. *Id.* at 495, 97 S.Ct. 711. In contrast, arrangements for the Alvarado interview were made by his parents, who accompanied him to the police station; moreover, Alvarado was never told he was *not* under arrest. Second, the interview in *Mathiason* lasted only thirty minutes, and the suspect admitted his guilt within the first five minutes. *Id.* at 493, 97 S.Ct. 711. In the case now before us, Alvarado was interviewed for a full two hours and repeatedly denied any involvement in the shooting incident. Only after he was subjected to various interrogation tactics designed to break down his defenses did he offer any incriminating statements. Moreover, these statements occurred well into the course of the interview.[2] Third, the suspect in *Mathiason* was a parolee who obviously had some knowledge of the criminal justice system. *Id.* In contrast, Alvarado had no prior experience with the police. To buttress this point, Alvarado directs our attention to *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), which reasoned:

> Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the [Fifth Amendment] privilege.

*Id.* at 433, 104 S.Ct. 1136 (ruling that parolee who gave incriminating testimony during scheduled meeting with parole officer was not "in custody" for purposes of *Miranda*).

Based on these considerations, we agree with Alvarado that the Supreme Court authorities relied on by the state court do not control the specific facts of this case. Namely, Alvarado was only 17 years old and had no criminal history when the interview occurred, it lasted for approxi-

---

**2.** The record contains 61 pages of interview transcript. Discussion of the shooting—and Comstock's disbelief in Alvarado's initial account of events—does not begin until page 20, approximately one-third of the way into the two hour interview. Thus, approximately 40 minutes had elapsed before Alvarado began to discuss his knowledge of the shooting and his role in hiding the murder weapon.

mately two hours (the interviews in *Mathiason* and *Beheler* lasted thirty minutes) and his parents, who brought Alvarado to the police station at the request of Detective Comstock, were refused permission to be present during the interview.

Although both Alvarado and the State make their "in custody" arguments under an objective standard, Alvarado's status as a minor is an important subsidiary issue that potentially alters the constitutional analysis. Unfortunately, this issue was essentially ignored in the prior state and federal court proceedings. The State cites *United States v. Erving L.*, 147 F.3d 1240 (10th Cir.1998), to establish that the standard for evaluating the existence of "custody" remains objective. However, our own reading of *Erving L.* suggests that the Tenth Circuit did employ the objective standard, but modified it to account for the defendant's status as a minor. *See id.* at 1248 ("Given these facts, *a reasonable juvenile* in E.L.'s position would not have believed that the officers had curtailed his freedom of movement to a degree associated with formal arrest.") (emphasis added). Alvarado seems to adopt a similar age-modified objective standard, albeit without legal citation, when he makes the following argument:

> A reasonable 17–year–old with no prior experience with being questioned by law enforcement would most likely believe that if he is at a police station being questioned by a police officer and the officer is stating repeatedly that she knows that he is lying and he is being cajoled to tell the truth, that he is not free to get up and leave, at least not until he has satisfied the officer's desire for the "truth."

Appellant's Br. at 16.

Under the Supreme Court's due process jurisprudence, a criminal defendant's age has long been a relevant factor in determining whether a confession or a waiver of a constitutional right was voluntary. *See, e.g., Withrow*, 507 U.S. at 693, 113 S.Ct. 1745 (noting that a defendant's "maturity" is one of the factors used to determine if a defendant's confession was voluntary); *Michael C.*, 442 U.S. at 725, 99 S.Ct. 2560 ("Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination."); *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041 (stating that determination whether consent to search a car was voluntary is made under the totality of circumstances, including "the youth of the accused"); *In re Gault*, 387 U.S. at 45, 87 S.Ct. 1428 ("This court has emphasized that admissions and confessions of juveniles require special caution."); *Gallegos*, 370 U.S. at 54, 82 S.Ct. 1209 (ruling under the totality of circumstances that confession of 14–year old to charges of assault and robbery could not be "compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions"); *Haley*, 332 U.S. at 599–601, 68 S.Ct. 302(ruling that murder confession made by 15–year old without consultation with counsel or parents "cannot be judged by the more exacting standards of maturity" and that defendant's due process rights had thus been violated).

Another possible dimension of the present case is how parental authority over a minor, who happens to be a criminal suspect, affects the "in custody" determination. This aspect may be particularly difficult to analyze because custodial status may be viewed as essentially ancillary to the issue of coercion. That is, certain police actions may be coercive in part because they take place in a setting where the suspect does not reasonably feel free to leave, and thereby escape the application of coercive measures.

Here, the involvement of Alvarado's parents and, most relevantly, their absence from the interrogation at the behest of the police, may be significant factors in the events leading up to his incriminating statements. First, Comstock enlisted the parental control of Alvarado's parents over their minor son by approaching Alvarado's mother rather than going directly to him. So the delivery of Alvarado to the sheriff's station (with its consequent restriction of his freedom of movement) was effected indirectly by Comstock (but with the intervening aid of the parents) and without any manifestation of assent by Alvarado to the exercise of official authority. Second, Alvarado was denied the protective presence of his parents when Comstock denied their request to be present during the interview. Their "protective presence" would appear, at least on the face of things, to be more relevant to the coercive conduct of the interview than to their having any role in facilitating Alvarado's freedom to leave the interrogation room.[3]

To assess how and whether parental involvement and/or juvenile status affect the "in custody" determination for *Miranda* purposes, we find *In re Gault* instructive. This case also involved the interrogation of a juvenile, although, of course, the "in custody" status itself was not in dispute. 387 U.S. at 42–43, 87 S.Ct. 1428. But the reasoning of the Supreme Court is important:

> [T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.
>
> The "confession" of Gerald Gault was first obtained by Officer Flagg, out of the presence of Gerald's parents, without counsel and without advising him of his right to silence, as far as appears.

*Id.* at 55–56, 87 S.Ct. 1428 (footnote omitted).

The "greatest care" principle cited in *Gault* appeared in the context of determining the minimum due process requirements that attach to a juvenile's waiver of his Fifth Amendment privilege against self-incrimination. Yet, if a juvenile is

---

**3.** Although the ambiguous role of Alvarado's parents in contributing to the "in custody" prong of the analysis (in contrast to their significance to the larger issue of coercion) is hard to parse, we are aware of the Supreme Court's admonition in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), that "the Fifth Amendment Privilege is not concerned' with moral and psychological pressures to confess emanating from sources other than official coercion.' " *Id.* at 170, 107 S.Ct. 515 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). And in *Erving L.*, the Tenth Circuit determined that *Connelly* applied to a juvenile setting where the suspect's parents urged him to "cooperate with the officers to 'clear his conscience.' " 147 F.3d at 1248. Neither *Erving L.'s* quite distinguishable exercise of parental intervention nor the dicta in *Connelly* involving the coercive significance of a psychotic "voice of God" seem to have much to do with the role of the parents in the case before us.

more susceptible to police coercion during a custodial interrogation than would be a similarly situated adult, there is no reason why the same juvenile would not similarly be less capable of determining whether he was, in fact, in custody in the first place.[4] In the case now before us, 17 year-old Alvarado was subjected to a two-hour interrogation in a police interrogation room, with Comstock's expressing disbelief in Alvarado's version of events and informing him that she had witnesses who said "quite the opposite." Instead of exercising the "greatest care" to ensure that Alvarado's statements were not the product of his youth and inexperience with police, *id.* at 55, 87 S.Ct. 1428, Comstock essentially ignored Alvarado's status as a minor. At a

minimum, Comstock could have accommodated Alvarado's parents, who were then waiting in the station lobby, by allowing them to be present during the interview with their son.

. When applying the "totality of circumstances" test for an "in custody" determination, we believe that the state court fell short when it failed to address, much less analyze, Alvarado's status as a minor. Based on the Supreme Court's jurisprudence dealing with the special due process considerations that pertain to juvenile defendants, we see no principled reason why similar safeguards, commensurate with the age and circumstances of a juvenile defendant, would not apply equally to an "in custody" determination.[5] Moreover, the

---

4. The Court's holding in *Gault* was explicitly limited to the adjudicative phase of juvenile proceedings. *See* 387 U.S. at 31 n. 48, 87 S.Ct. 1428 ("The problems of pre-adjudication treatment of juveniles, and of post-adjudication disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process."). The juvenile defendant in *Gault* was convicted of delinquency based solely on a confession that the Court determined was constitutionally defective. *Id.* at 56, 87 S.Ct. 1428. The Court thus held that without a valid confession, "a determination of delinquency and an order of commitment to a state institution cannot be sustained in the absence of sworn testimony subjected to the opportunity for cross-examination in accordance with our law and constitutional requirements." *Id.* at 57, 87 S.Ct. 1428. However, the fact that the Court limited its holding in this way does not weaken the opinion's persuasive reasoning; rather, it speaks to procedural peculiarities of the juvenile process that are not at issue in the present case.

5. When we survey the landscape of state court decisions, we note that every jurisdiction that has squarely addressed the issue has ruled that juvenile status is relevant to the "in custody" determination, either as a factor under the totality of circumstances test, or by way of modification to the reasonable person standard. *See In re Jorge D.*, 202 Ariz. 277,

43 P.3d 605, 608–09 (2002) (ruling that objective test applies to juvenile context, "but with additional elements that bear upon a child's perceptions and vulnerability, including the child's age, maturity and experience with law enforcement"); *Ramirez v. State*, 739 So.2d 568, 574 (Fla.1999) (applying "reasonable juvenile" standard to determine whether the defendant "would have believed that he was in custody at the time of the interrogation at the police station"); *In re L.M.*, 993 S.W.2d 276, 288–89 (Tex.App.1999) (surveying the large number of state courts that have included age as a factor in an "in custody" determination and adopting a rule that "*expressly* provides for consideration of age under the reasonable-person standard established [by the U.S. Supreme Court] in *Stansbury* ") (emphasis added); *State v. D.R.*, 84 Wash.App. 832, 930 P.2d 350, 353 (1997) (applying standard of "whether a 14 year old in [the defendant's] position would have reasonably supposed his freedom of action was curtailed") (quotations omitted); *In re Joshua David C.*, 116 Md.App. 580, 698 A.2d 1155, 1162 (1997) (stating that a juvenile in-custody determination "must consider additional factors, such as the juvenile's education, age, and intelligence"); *In re Doe*, 130 Idaho 811, 948 P.2d 166, 173 (App.1997) (ruling that objective test applied to in-custody determination for *Miranda* purposes, "but with additional elements ... including the child's age, maturity and experience with law enforcement"); *People v. T.C.*, 898 P.2d 20, 25 (Colo.1995) (en

issue of parental involvement, at the behest of police officials, to arrange the police interview with Alvarado and the subsequent refusal by police to let his parents attend the interview are certainly relevant issues in the totality of circumstances. *See Thompson*, 516 U.S. at 113, 116 S.Ct. 457 (stating that "in custody" determination is made against the backdrop of historical facts that make up the "totality of circumstances"); *see also* note 3, *supra*.[6] Considering these additional factors in the objective determination of custodial status, we do not believe that a reasonable 17-year-old in Alvarado's position would have felt "at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457; *cf. Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138 (holding that "the only relevant inquiry [in an 'in custody' determination] is how a reasonable man in the

banc) (ruling that "the circumstances of the interrogation, including the length of the interrogation and the fact that it involved an eleven-year-old, would lead a reasonable person in [the defendant's] situation to feel that he had no choice but to stay and listen to the officer") (quotations omitted); *In re Loredo*, 125 Or.App. 390, 865 P.2d 1312, 1315 (1993) (constructing test "whether a reasonable person in child's position—that is, a child of similar age, knowledge and experience, placed in a similar environment—would have felt required to stay and answer all of [the officer's] questions"); *In re Robert H.*, 194 A.D.2d 790, 599 N.Y.S.2d 621, 623 (1993) ("Under the circumstances, we conclude that a reasonable 15-year-old, in the position of Robert, would not have believed he was free to leave the scene."); *Commonwealth v. A Juvenile*, 402 Mass. 275, 521 N.E.2d 1368, 1370 (1988) ("On the question whether the juvenile was in custody, the test is how a reasonable person in the juvenile's position would have understood his situation."); *People v. Savory*, 105 Ill.App.3d 1023, 61 Ill.Dec. 737, 435 N.E.2d 226, 230 (1982) (stating that "[n]umerous factors" are relevant to the in custody determination, including "the age, intelligence and mental makeup of the accused").

suspect's position would have understood his situation").

## B.

We proceed now to the second level of the prescribed inquiry, which requires the narrower focus whether the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court held that the "contrary to" and "unreasonable application" clauses represent alternative grounds for habeas relief. *Id.* at 404–05, 120 S.Ct. 1495.[7]

■ The Supreme Court has recently confirmed the narrow inquiry available under the first clause. A state court acts

6. State courts have also acknowledged the absence of parents as a relevant factor under the totality of circumstances. *See, e.g., Doe*, 948 P.2d at 173 (ruling that objective test applied to in custody determination for *Miranda* purposes, "but with additional elements ... including ... the presence of a parent or other supportive adult"); *State v. J.Y.*, 623 So.2d 1232, 1234 (Fla.Dist.Ct.App. 1993) (considering "juvenile's age" and "lack of a parent being present" as relevant factors under the totality of circumstances).

7. *Williams* resulted in a highly fractured decision by the Supreme Court in which only specific parts of the lead opinion by Justice Stevens were adopted by a majority of the Court. 529 U.S. at 367, 120 S.Ct. 1495. However, Part II of Justice O'Connor's concurrence was joined by Chief Justice Rehnquist and Justices Kennedy, Thomas and Scalia, thus making it the opinion of the Court for matters discussed in it. *Id.* at 399, 120 S.Ct. 1495. Part II of Justice O'Connor's concurrence addresses the proper interpretation of 28 U.S.C. § 2254(d)(1), which is at issue in the case now before us.

contrary to established precedents if it " 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.' " *Early v. Packer*, —— U.S. ——, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (citing *Williams*, 529 U.S. at 405, 120 S.Ct. 1495).

▇ Under the second clause, a state court's decision involves an "unreasonable application" of federal law if it either (1) correctly identifies the governing legal rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir.2002) (citing *Van Tran*, 212 F.3d at 1148); *Anthony*, 236 F.3d at 578 (citing *Williams*, 529 U.S. at 404–06, 120 S.Ct. 1495). As explained, *infra*, we believe this case is best analyzed under the "unreasonable application" clause of the AEDPA.

▇ In reviewing a state court judgment under the AEDPA, "we examine the state court's last reasoned decision." *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 7 (9th Cir.2002); *see also Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000). Our analysis under the "unreasonable application" clause is guided by the doctrine of "clear error." *Anthony*, 236 F.3d at 578. Under this standard, reversal is warranted "only where the court of appeals is left with a 'definite and firm conviction' that an error has been committed." *Id.* (quoting *Van Tran*, 212 F.3d at 1153).

▇ Finally, a critical factor to bear in mind when analyzing a case under the "unreasonable application" clause is whether the relevant Supreme Court precedents can be fairly categorized as "clearly established" federal law. § 2254(d)(1). In *Williams*, the Supreme Court ruled that the phrase "clearly established Federal Law, as determined by the Supreme Court of the United States," § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of this Court's decisions." 529 U.S. at 412, 120 S.Ct. 1495; *see also Tyler v. Cain*, 533 U.S. 656, 664, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (stating that " 'determined' and 'held' are synonyms in the context of § 2254(d)(1)"). We determine de novo what is "clearly established federal law" within the meaning of the AEDPA. *LaJoie v. Thompson*, 217 F.3d 663, 668 (9th Cir.2000); *Canales v. Roe*, 151 F.3d 1226, 1228–29 (9th Cir.1998). If the federal law is not clearly established at the time of the state court determination, § 2254(d)(1) bars relief. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495.

We begin our AEDPA analysis by stating that Supreme Court case law has clearly established the general right that an interrogation without *Miranda* warnings violates the Fifth Amendment where, under the totality of circumstances, a reasonable person would not have felt free to terminate the conversation with police officials and leave; in other words, the person being interviewed is "in custody." *See Thompson*, 516 U.S. at 112, 116 S.Ct. 457; *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526; *Berkemer*, 468 U.S. at 440–42, 104 S.Ct. 3138; *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *Mathiason*, 429 U.S. at 494–95, 97 S.Ct. 711. Even acknowledging that the Supreme Court has not had a specific occasion to analyze how a defendant's juvenile status may alter an "in custody" determination, it does not follow that it would be *reasonable*, within the meaning of the AEDPA, for the police to ignore a juvenile's age and experience when applying the "totality of circumstances" test.

Turning to the AEDPA framework, we believe this case is best analyzed under the "unreasonable application" clause, which permits a writ of habeas corpus only if the judgment of the state court "(2) . . . fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Anthony*, 236 F.3d at 578 (citing *Williams*, 529 U.S. at 407, 120 S.Ct. 1495). The relevant legal principle here, amply supported by Supreme Court precedent, is that juvenile defendants are accorded heightened procedural safeguards commensurate with their age and experience. *Haley* and its progeny, *supra*, have clearly established this principle in the context of custodial interrogations. If juveniles are more susceptible to making "involuntary" confessions or waivers of their constitutional rights while in police custody, under an analogous totality of circumstances inquiry, these same Supreme Court cases compel the conclusion that a reasonable juvenile would be more susceptible to the impression that he "was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457. It cannot reasonably be argued that a factor that is so important in analyzing the conduct of a custodial interrogation can become insignificant in the analysis of the circumstances that give rise to that situation namely, in the factual setting that determines whether a juvenile is, in fact, "in custody."

In many respects, the present case would be more straightforward if the Cali-

fornia Court of Appeal had directly addressed the issue of Alvarado's age and inexperience with the police and concluded that these additional circumstances were simply irrelevant to the underlying question whether Alvarado was "in custody." If the court had made such a ruling (rather than skipping the analysis altogether), the constitutional infirmity would be facially apparent.

Our analysis involves the extension of the principle that juvenile status is relevant to the conduct of a custodial interrogation to the further determination whether a defendant is, in fact, "in custody." But our AEDPA precedents explicitly contemplate the possibility that such an extension may be required by relevant Supreme Court case law. *See Hernandez*, 282 F.3d at 1142 ("A state court's decision can involve an 'unreasonable application' of Federal law if it . . . 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable."); *Anthony*, 236 F.3d at 578 (same); *Van Tran*, 212 F.3d at 1150 (same).[8] In the case before us, we are compelled to this conclusion by the fact that a totality of circumstances approach applies equally to the appraisal of police conduct and to the "in custody" analysis. At least in the context of determining whether a juvenile "knowingly and voluntarily decided to forgo his [Fifth Amendment] rights to remain silent," the Supreme Court has unequivocally stated:

---

8. Additionally, as we have noted, every state court that has addressed this threshold question of how juvenile status affects the "in custody" analysis has ruled that juvenile status is a factor in the "in custody" determination. *See* note 5, *supra*. Of course, these cases often rely upon state court precedents to reach this conclusion. Unless and until a state court has determined that state constitutional protections do not make juvenile status relevant to the "in custody" determination,

the applicability of federal constitutional protections would ordinarily not be discussed by the state court's opinion. But, despite our exhaustive research, we have been unable to locate a single state court that has found juvenile status irrelevant. The unusual feature of the present case is that Alvarado squarely raised this issue, but the state court simply failed to undertake a meaningful analysis under either state or federal law.

The totality approach permits—*indeed, it mandates*—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Michael C.*, 442 U.S. at 725, 99 S.Ct. 2560 (emphasis added).[9]

The issue of waiver of his Fifth Amendment rights was never reached in the present case because Alvarado was never informed of his *Miranda* rights. And, as we have already noted, the cases upon which the state relies to support its contention that Alvarado was not "in custody" are distinguishable. In contrast to *Beheler* and *Mathiason*, Alvarado's "voluntary" appearance at the police station was not obtained through his own consent but instead through enlisting his mother's authority. Upon his arrival, Alvarado was never informed that he was *not* under arrest, and Detective Comstock summarily rejected his parents' request to be present during the interview. Alvarado was then escorted to an interrogation room and subjected to a full two hours of questioning. Despite the fact that Alvarado denied any knowledge or involvement in the shooting incident, Comstock repeatedly pressured Alvarado to tell the "truth" as allegedly defined by three notebooks of notes she had compiled from earlier witness interviews. Although Alvarado was permitted to use the telephone, this accommodation was not offered until well into the course of the interview, and only after Alvarado had made several incriminating statements.[10] Only at the end of the interview did Comstock inform Alvarado that he was free to leave.

After identifying these relevant circumstances, it is simply unreasonable to conclude that a reasonable 17–year–old, with no prior history of arrest or police inter-

---

**9.** It should be noted that the Court's holding in *Michael C.* has been viewed by some commentators as a retreat from its earlier decisions in which a defendant's juvenile status was arguably the controlling factor in the constitutional analysis. *See, e.g.,* Robert E. McGuire, Note, *A Proposal to Strengthen Juvenile Miranda Rights: Requiring Parental Presence in Custodial Interrogations,* 53 Vand. L.Rev. 1355, 1373–74 (2000) (noting that *Michael C.* "was a constriction of juvenile *Miranda* rights when read against *Haley, Gallegos* and *Gault* ...."). In *Michael C.,* the criminal defendant was a 16–year–old with an extensive criminal history who was accused of murder. After the defendant was taken into custody on a murder charge, the police read the defendant his *Miranda* rights. The defendant then requested the presence of his probation officer, which he subsequently argued was, in fact, an assertion of his Fifth Amendment rights. However, much to the chagrin of four dissenting justices, the majority rejected this argument. *See* 442 U.S. at 730, 99 S.Ct. 2560 (Marshall, J., dissenting) ("[A] juvenile's request for his probation officer should be treated as a per se assertion of Fifth Amendment rights."); *id.* at 733–34 & n. 4, 99 S.Ct. 2560 (Powell, J., dissenting) (disputing whether the interrogating officer had exercised "the greatest of care" as required by *Gault* and whether the 16–year–old defendant "was subjected to a fair interrogation free from inherently coercive circumstances"). The central issue that divided the Court in *Michael C.* was the extent to which a criminal defendant's juvenile status altered the waiver analysis under *Miranda.* However, as made clear by the passage from *Michael C.* quoted in the text, juvenile status remains an important factor in a due process waiver analysis. The rule articulated by the majority is in no way diminished by the fact that the four dissenting justices urged an *even more* robust rule affecting juvenile defendants. Indeed, unlike the present case, the juvenile's experience with the police was a major factor in the Court's totality of the circumstances analysis.

**10.** We estimate that the time elaspsed at this point in the interview was approximately 40 minutes. *See* note 2, *supra.*

views, would have felt that he was "at liberty to terminate the interrogation and leave." *Thompson,* 516 U.S. at 112, 116 S.Ct. 457. Moreover, when we apply the "clear error" standard, which guides our analysis under the "unreasonable application" clause of § 2254(d)(1), the totality of circumstances in this case is so compelling that we are "left with a 'definite and firm conviction' that an error has been committed." *Anthony,* 236 F.3d at 578 (quoting *Van Tran,* 212 F.3d at 1153).

### C.

██ Before we can conclude that Alvarado is entitled to federal habeas relief, we must consider whether improper admission of his incriminating statements by the state court had a "substantial and injurious effect" on the subsequent jury verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (defining magnitude of constitutional error that is sufficient to justify habeas relief); *Benn,* 283 F.3d at 1052 n. 6 (noting that all AEDPA cases must satisfy the requirements of *Brecht* ); *Bains,* 204 F.3d at 977 (joining "the vast majority of our sister circuits by deciding that the *Brecht* standard should apply uniformly in all federal habeas corpus cases under § 2254"). Here, we do not hesitate to conclude that the admission of Alvarado's statements during the interrogation by Detective Comstock, which were tape-recorded and played in open court, had a substantial and injurious effect on the jury's verdict.

The state argues that the *Brecht* threshold has not been met because, in the absence of testimony by detective Comstock about the contents of her two-hour interview with Alvarado, the jury would have nonetheless reached a guilty verdict based on the testimony of Manuel Rivera. We disagree. In order to illustrate the relative weakness of Rivera's testimony, we will summarize certain pertinent background facts.

According to Rivera's direct testimony at trial, Rivera, Alvarado, Paul Soto (Alvarado's co-defendant) and several other youths gathered at Rivera's house on the night of September 22, 1995. Rivera testified that throughout the course of the evening he consumed "about two 40–ouncers" of Budweiser along with "Strawberry wine, [and] some more beer." After midnight, the gathering left the house and moved into a parking lot area beside an adjacent shopping center. The victim drove his pick-up truck into the parking lot and stationed himself near a dumpster, where he proceeded to collect cardboard boxes. According to Rivera, Paul Soto uttered the exclamation, "Let's jack," which Rivera interpreted as meaning that Soto and at least some other members of the gathering should steal the pick-up truck. However, at that very moment, Alvarado was in a nearby doughnut store. A few minutes later, Alvarado returned, and Soto repeated the words, "Let's jack." Rivera then testified that Alvarado responded to Soto's suggestion by saying, "Let's do it." Soto and Alvarado then approached the pick-up truck with Soto proceeding to the driver's side and Alvarado approaching the passenger's side. Rivera stated that a conversation between the victim and Soto ensued, but that he could not see the victim from his vantage point. However, he inferred from Soto's hand gestures that a conversation was taking place. By Rivera's account, the pick-up truck was too far away for him to hear the contents of the conversation. At this point, a shot rang out and the group immediately retreated to Rivera's house. Soto went into Rivera's bedroom to take off a blood-stained shirt. Rivera then came into the bedroom and saw a black semi-automatic revolver on the floor. Rivera continued to testify that he, Soto and Alvarado subsequently went to the park to hide the gun.

Although on direct examination Rivera's account of the evening was fairly coherent, the cross-examination of Rivera by Alvarado's lawyer exposed numerous inconsistencies and weaknesses. Rivera admitted that during his earlier statements to police he had never stated that Soto *twice* uttered the phrase "Let's jack." This ambiguity is relevant because Rivera claimed that Alvarado only heard Soto utter these words the second time, *after* he returned from the nearby doughnut shop. Rivera also acknowledged that on an earlier occasion, he had confided to Alvarado's lawyer, and to a defense investigator for Alvarado, that he really could not say with certainty whether Alvarado had uttered the words, "Let's do it" or a similar exhortation and that his memory had faded since the events of September 22. Moreover, Rivera conceded that he had also smoked marijuana that night and at the time of the shooting was somewhat "stoned." Rivera admitted that from his vantage point he could not see where Alvarado was standing in relation to the pick-up truck. Perhaps most damaging to the state's case, however, was Rivera's bald admission that on several occasions he had told police that *only* Soto and Alvarado had gone to the park to hide the gun, and that all of these earlier statements had been false. Rivera said that he agreed to testify after consulting his lawyer and after he had been offered immunity. Hence, he could not now be prosecuted for any of the crimes involved in the present case.

The cross-examination of Rivera, when considered in the absence of Alvarado's incriminating statements, also casts doubt on the theory that Alvarado and Soto acted in concert. Rivera stated that he had been a close friend of Alvarado for approximately two years before the shooting incident. During that time, he had never seen Soto and Alvarado together, nor did he have any basis to believe that they even knew each before the night in question. Rivera claimed that he himself had just met Soto that evening and that he had no knowledge, before hearing the gunshot, that Soto or anyone else had a gun. Without corroborating evidence, it might seem implausible that Alvarado, who had no prior criminal record, would have agreed to commit a car jacking at gun point with someone he had met only a few hours earlier.

That said, the essential elements of Rivera's story, such as the bloody shirt and the hiding of the gun, are certainly more plausible when corroborated by Alvarado's own selfincriminating statements. If these statements had been excluded from evidence because Alvarado was not given *Miranda* warnings, the entire case against Alvarado would have come down to Rivera's inconsistent account and the testimony of Valerie Garcia (one of the youths who gathered at Rivera's house and later in the adjacent parking lot). Garcia testified that she remembered Soto and Alvarado walking off in the same general direction. Garcia stated that thereafter, when the shooting occurred, she was facing away from the direction of the pick-up truck. We believe that a witness (Rivera), who has been drinking heavily, is plagued by a tricky memory and has been granted immunity with respect to the crime for which Alvarado was prosecuted, is not powerfully credible. And Garcia added precious little that was specific to Rivera's account. There is, therefore, a high probability that Alvarado's improperly admitted statements were the lynchpin of his conviction.

The state attempts to buttress its *Brecht* argument by pointing out that Alvarado testified in his own defense; therefore, his incriminating statements would have been admissible in any event in rebuttal. *See Oregon v. Hass*, 420 U.S. 714, 723–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (evidence obtained in violation of *Miranda* may be

used for impeachment); *Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (same). However, Alvarado's current counsel argues that the strategic decision about whether or not Alvarado should take the stand may have been strongly influenced by the government's use of his confession. Therefore, Alvarado's live testimony can hardly be taken for granted. *See Elstad*, 470 U.S. at 317, 105 S.Ct. 1285 (" 'Having' released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.' " (quoting *Harrison v. United States*, 392 U.S. 219, 224–25, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968))). Based on our own examination of the record, there appears to be a strong possibility that Alvarado, if not confronted by his own statement to Comstock, would not have testified in his own defense. This being the case, we believe that the self-incriminating statements clearly pass the *Brecht* test of having a substantial and injurious effect on the jury verdict.

### III.

The district court's denial of Alvarado's petition for writ of habeas corpus is REVERSED. On remand, the district court shall enter judgment granting a conditional writ of habeas corpus directing that Alvarado be released from custody unless the state begins trial proceedings within 120 days of the issuance of the mandate.